**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| A TO Z WHOLESALE, INC., | No. 1:25-cv-14947 |
| Plaintiff, | |
| v. | Matthew F. Kennelly, District Judge |
| KINSALE INSURANCE COMPANY, | Jeannice W. Appenteng, Magistrate Judge |
| Defendant, and | |
| KINSALE INSURANCE COMPANY, | |
| Counter-Plaintiff, | |
| v. | |
| A TO Z WHOLESALE, INC., | |
| Counter-Defendant. | |

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM
FOR DECLARATORY JUDGMENT**

Defendant/Counter-Plaintiff Kinsale Insurance Company ("Kinsale"), for its Answer, Affirmative Defenses, and Counterclaim for Declaratory Judgment, states as follows:

**ANSWER**

INTRODUCTION

1. This action arises from Defendant Kinsale Insurance Company's ("Kinsale" or "Defendant") failure to fully pay covered losses under a commercial insurance policy issued to Plaintiff A to Z Wholesale, Inc. ("A to Z" or "Plaintiff"). Plaintiff's retail inventory was destroyed by a January 10, 2022 warehouse fire. Although the Policy covers the loss and Defendant eventually made a partial payment, Kinsale has refused, after nearly five years, to

pay the remaining $4,963,060.67 owed on the policy. A to Z brings this action to obtain the balance of its insured loss and related statutory and common-law remedies.

**ANSWER: Kinsale admits that it issued an insurance policy to A to Z Wholesale, Inc. ("A to Z"), that A to Z submitted a claim for losses allegedly arising from a fire on January 10, 2022, that Kinsale issued a payment of $1,330,065 to A to Z for that claim, and that Kinsale has not made a further payment on that claim. Kinsale denies the remaining allegations set forth in Paragraph 1.**

THE PARTIES

2. At all relevant times, A to Z was a corporation organized under the laws of the State of Indiana, with its principal place of business located in Indiana.

**ANSWER: Kinsale admits the allegations set forth in Paragraph 2.**

3. Kinsale is an insurance company organized under the laws of the State of Arkansas, with its principal place of business in Richmond, Virginia.

**ANSWER: Kinsale admits the allegations set forth in Paragraph 3.**

JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different States.

**ANSWER: Kinsale admits the allegations set forth in Paragraph 4.**

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (3) and (c)(2) because the defendant is subject to personal jurisdiction in this District and therefore resides in this District for venue purposes. The insurance policy provides that, if the Company fails to pay any amount claimed to be due, it "will submit to the jurisdiction of any court of competent jurisdiction within the United States of America or Canada." This contractual consent confirms

that the Company may be sued in this Court. Accordingly, venue is proper in the Northern District of Illinois.

**ANSWER:** **Kinsale admits that its insurance policy contains a Service of Suit clause, which A to Z has quoted in part. The Kinsale Policy is a writing, speaks for itself, and is the best evidence of the Kinsale Policy's terms. Kinsale refers the Court to its Policy for a full and accurate rendition of its terms and denies any allegations to the extent they are inconsistent with the terms of the Kinsale Policy. Kinsale waives the defenses of lack of personal jurisdiction and improper venue under Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure. Kinsale denies the remaining allegations set forth in Paragraph 5.**

FACTS RELEVANT TO ALL CLAIMS

6. During 2021 and 2022, A to Z operated as a wholesaler of electronic-cigarette-related products, including vaping pens, smoking pods, and related inventory purchased in bulk for resale to retailers.

**ANSWER:** **Kinsale admits that when A to Z applied for coverage in October 2021, it identified itself as a general tobacco wholesaler. Kinsale lacks knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 6, and therefore denies the same.**

7. In January 2022, A to Z stored all of its inventory at a warehouse located at 5455 W. 5th Avenue, Brunswick, Indiana ("the Warehouse").

**ANSWER:** **Kinsale lacks knowledge or information sufficient to admit or deny the allegations of Paragraph 7, and therefore denies the same.**

8. At all times relevant, A to Z was insured under Kinsale Policy Nos. 0100169032-0 ("the Policy"), attached and incorporated hereto as **Exhibit A**, which covered inventory losses.

**ANSWER:** **Kinsale admits that it issued Primary Property Policy Number 0100169032-0 (the "Policy") to A to Z for the initial policy period November 15, 2021 through November 15, 2022, but states that the Policy was cancelled March 17, 2022 for non-payment of premium. Kinsale further admits that the coverage provided by the Policy is determined by the terms, conditions, limitations, and exclusions set forth in the Policy itself. Kinsale denies that the document attached as Exhibit A to the Complaint is a complete and correct copy of the Policy. Kinsale denies the remaining allegations set forth in Paragraph 8.**

9.      On or about January 10, 2022, a fire occurred at the Warehouse ("the Fire"), causing extensive damage to the structure and entirely destroying A to Z's inventory.

**ANSWER:** **Kinsale admits a fire occurred on January 10, 2022 at 5415 West 5th Avenue, Brunswick, Indiana (the "Location"). Kinsale lacks knowledge or information sufficient to admit or deny the allegations of Paragraph 9, and therefore denies the same.**

10.     The Policy was in full force and effect at the time of the Fire.

**ANSWER:** **Kinsale admits the Policy was in effect on January 10, 2022. Kinsale denies any remaining allegations set forth in Paragraph 10.**

11.     A to Z sustained a loss of $6,293,125.67 in destroyed inventory value in the Fire.

**ANSWER:** **Kinsale denies the allegations set forth in Paragraph 11.**

12.     On or about January 11, 2022, A to Z submitted a claim with Kinsale seeking coverage for its fire-related inventory loss.

**ANSWER:** **Kinsale admits that A to Z submitted a claim on January 11, 2022— one day after the fire—seeking coverage for losses it claimed to have sustained due to the fire at the Location. Kinsale denies the remaining allegations set forth in Paragraph 12.**

4

13.     After approximately two years of investigation, Kinsale issued a partial payment of $1,330,065.00 to A to Z in or around January 2024, but has refused to pay the remaining $4,963060.67.

**ANSWER:    Kinsale admits that it investigated A to Z's claim and made an unconditional payment of $1,330,065 to A to Z, which represented the full amount owed based on the information and documentation provided to Kinsale.  Kinsale denies the remaining allegations set forth in Paragraph 13.**

14.     Kinsale's partial payment constitutes a binding acknowledgement that the fire was a covered peril under the policy and that A to Z sustained a covered inventory loss.

**ANSWER:    Kinsale admits that the information and documentation submitted by A to Z during Kinsale's investigation established that A to Z sustained a loss, and pursuant to the terms and conditions of the Policy, Kinsale paid the full amount of the loss established by A to Z.  The Kinsale Policy is a writing, speaks for itself, and is the best evidence of the Kinsale Policy's terms.  Kinsale refers the Court to its Policy for a full and accurate rendition of its terms and denies any allegations to the extent they are inconsistent with the terms of the Kinsale Policy.  Kinsale denies the remaining allegations set forth in Paragraph 14.**

15.     A to Z seeks recovery of the remaining $4,963,060.67 owed under the Policy.

**ANSWER:    Kinsale admits that A to Z seeks additional amounts under the Policy, but Kinsale denies that A to Z is entitled any additional payment.  Kinsale denies the remaining allegations set forth in Paragraph 15.**

16.     A to Z is the entity entitled to all proceeds or benefits from the Policy attributable to its fire-related inventory loss.

**ANSWER:** **Kinsale admits that A to Z is the named insured under the Policy. Kinsale lacks knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 16, and therefore denies the same.**

17. Kinsale's obligation to pay A to Z has matured, as A to Z has sustained a covered loss and satisfied all conditions precedent.

**ANSWER:** **Kinsale admits that the information and documentation submitted by A to Z during Kinsale's investigation established that A to Z sustained a loss, and pursuant to the terms and conditions of the Policy, Kinsale paid the full amount of the loss established by A to Z. Kinsale denies the remaining allegations set forth in Paragraph 17.**

18. By delaying and refusing to timely pay the remaining amount owed, Kinsale has breached its obligations under the Policy.

**ANSWER:** **Kinsale denies the allegations set forth in Paragraph 18.**

COUNT I - DECLARATORY JUDGMENT (28 U.S.C. § 2201)

19. A to Z realleges and incorporates by reference paragraphs 1 through 18 as though fully set forth herein.

**ANSWER:** **Kinsale reasserts and incorporates herein by reference its responses to Paragraphs 1 through 18, as if set forth fully herein.**

20. An actual, present, and justiciable controversy exists between the parties regarding coverage for the losses sustained in the Fire and the amount owed under the Policy.

**ANSWER:** **Kinsale admits the allegations set forth in Paragraph 20.**

21. Plaintiff contends that the Policy covers the entirety of the Fire-related inventory loss and that Defendant is obligated to pay the remaining $4,963,060.67; Defendant has failed and refused to do so.

**ANSWER:** **Kinsale admits that A to Z seeks additional amounts under the Policy, but Kinsale denies that A to Z is entitled to any additional payment. Kinsale denies the remaining allegations set forth in Paragraph 21.**

22. Plaintiff seeks a declaration that:

   a) the Policy affords coverage for Plaintiff's Fire-related inventory loss;

   b) Defendant must pay the remaining covered amount of $4,963,060.67; and

   c) any limitations, deductibles, or sublimits have been satisfied or do not bar recovery.

**ANSWER:** **Kinsale admits that Paragraph 22 describes the relief sought by A to Z. Kinsale denies that A to Z is entitled to the relief described in Paragraph 22. Kinsale denies any remaining allegations set forth in Paragraph 22.**

WHEREFORE, Plaintiff, A TO Z WHOLESALE, INC., requests that the Court enter a judgment in its favor and against Kinsale Insurance Company, declaring that the Policy provides coverage for the Fire loss to Plaintiff's inventory and that Defendant must pay Plaintiff the remaining $4,963,060.67, together with costs and such other relief as the Court deems just and proper.

**ANSWER:** **Kinsale denies that A to Z is entitled to any of the relief described in this prayer for relief. Kinsale denies the remaining allegations set forth in this unnumbered paragraph.**

### COUNT II - VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 et seq.)

**Kinsale filed a Motion to Dismiss Count II pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF 20), and accordingly provides no Answer to Count II at this time. To the extent a response is deemed necessary, Kinsale denies each and every allegation contained in Paragraphs 23 through 28.**

COUNT III - BREACH OF CONTRACT

29.     Plaintiff realleges and incorporates by reference paragraphs 1 through 28 as though fully set forth herein.

**ANSWER:     Kinsale reasserts and incorporates herein by reference its responses to Paragraphs 1 through 28, as if set forth fully herein.**

30.     The Policy is a valid and enforceable contract between Plaintiff and Defendant that was in effect at the time of the Fire.

**ANSWER:     Kinsale admits the allegations set forth in Paragraph 30.**

31.     Plaintiff satisfied all conditions precedent, or such conditions have occurred, been waived, or are excused, including timely notice and claim submission.

**ANSWER:     Kinsale denies the allegations set forth in Paragraph 31.**

32.     Defendant breached the Policy by failing to pay the full covered loss arising from the Fire, issuing only a partial payment and failing to pay the remaining $4,963,060.67.

**ANSWER:     Kinsale denies the allegations set forth in Paragraph 32.**

33.     As a direct and proximate result of Defendant's breach, Plaintiff suffered damages in the amount of $4,963,060.67.

**ANSWER:     Kinsale denies the allegations set forth in Paragraph 33.**

34.     Defendant's conduct constitutes an unreasonable and vexatious delay of payment under 815 ILCS 205/2, warranting prejudgment interest.

**ANSWER:     Kinsale denies the allegations set forth in Paragraph 34.**

WHEREFORE, Plaintiff, A TO Z WHOLESALE, INC., requests that the Court enter judgment in its favor and against Kinsale Insurance Company for damages in the amount of $4,963,060.67, together with costs, pre-judgment interest, and such other relief as the Court deems just and proper.

**ANSWER:** **Kinsale denies that A to Z is entitled to any of the relief described in this prayer for relief. Kinsale denies the remaining allegations set forth in this unnumbered paragraph.**

COUNT IV - STATUTORY BAD FAITH (215 ILCS 5/155)

35. Plaintiff realleges and incorporates by reference paragraphs 1 through 34 as though fully set forth herein.

**ANSWER:** **Kinsale reasserts and incorporates herein by reference its responses to Paragraphs 1 through 34, as if set forth fully herein.**

36. Kinsale is an insurer and the Policy constitutes a policy of insurance under 215 ILCS 5/155.

**ANSWER:** **Kinsale admits that it is an insurer and that the Policy is a policy of insurance. Kinsale denies any remaining allegations set forth in Paragraph 36.**

37. After acknowledging coverage by making a partial payment after an already lengthy two-year investigation, Defendant engaged in further unreasonable and vexatious delay by refusing to pay the remaining covered amount of $4,963,060.67 despite an investigation now spanning almost five years.

**ANSWER:** **Kinsale admits that it investigated A to Z's claim and made an unconditional payment of $1,330,065 to A to Z, which represented the full amount owed based on the information and documentation provided to Kinsale. Kinsale denies the remaining allegations set forth in Paragraph 37.**

38. Defendant's conduct forced Plaintiff to incur attorneys' fees and other expenses to obtain amounts due under the Policy.

**ANSWER:** **Kinsale denies the allegations set forth in Paragraph 38.**

39. The lengthy delay has diminished the value of the of the Policy benefits, through inflation and substantial increases in the cost of replacing the destroyed inventory.

**ANSWER:** **Kinsale denies the allegations set forth in Paragraph 39.**

WHEREFORE, Plaintiff, A TO Z WHOLESALE, INC., requests that the Court enter judgment in its favor and against Kinsale Insurance Company awarding reasonable attorneys' fees, costs, and statutory penalties, and such other relief as the Court deems just and proper.

**ANSWER:** **Kinsale denies that A to Z is entitled to any of the relief described in this prayer for relief. Kinsale denies the remaining allegations set forth in this unnumbered paragraph.**

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, A TO Z WHOLESALE, INC., prays this Honorable Court grants it a judgment on its favor and against Defendant Kinsale Insurance Company on all issues pled herein and enter an Order as follows:

a) Awarding Plaintiff $4,963,060.67 for its unpaid losses as sustained in the Fire; and

b) Awarding Plaintiff its attorneys' fees, costs, statutory damages, prejudgment interest, punitive damages, and any further relief this Court deems necessary and just.

**ANSWER:** **Kinsale denies that A to Z is entitled to any of the relief described in this prayer for relief. Kinsale denies the remaining allegations set forth in this unnumbered paragraph.**

**<u>OMNIBUS DENIAL</u>**

**Kinsale denies each and every allegation in the Complaint, including all headings, except as expressly admitted above.**

**<u>AFFIRMATIVE DEFENSES</u>**

The following affirmative and other defenses are based on presently known information. Kinsale reserves its right to amend this Answer to include additional defenses

10

based upon later acquired information. Kinsale does not, by alleging the defenses below, admit that it bears the burden of persuasion or proof as to any issue or element that is properly Plaintiff's burden of persuasion or burden of proof.

### First Affirmative Defense

A to Z's claims are barred because Kinsale is entitled to rescission of the Policy due to material misrepresentations made by A to Z in the written application for coverage.

### Second Affirmative Defense

A to Z's claims are barred, in whole or in part, by the Policy's Protective Safeguards Endorsement, which provides, in part as follows:

As a condition of this insurance, you are required to:

1. Maintain the protective safeguards listed in the Schedule, and over which you have control, in complete working order;

2. Actively engage and maintain in the 'on' position at all times any automatic fire alarm or other automatic system listed in the Schedule; and

3. Notify us if you know of any suspension of or impairment in any protective safeguard listed in the Schedule...

A true and correct copy of the Kinsale Policy is attached as **Exhibit 7** to Kinsale's counterclaim. Ex. 7 (Policy, Protective Safeguards Endorsement, Section A.)

One of the Protective Safeguards it was required to maintain was a "Video Surveillance System", including related data storage services. (Policy, Protective Safeguards Endorsement, Schedule.) The Policy defines "Video Surveillance System" as follows:

a. Interior and exterior video cameras that are:

(1) Capable of recording in daylight and hours of darkness;

(2) Operable in all weather conditions;

(3) Functional twenty-four (24) hours a day, seven (7) days a week; and

(4) Cover all exterior doors and windows.

11

b.  Data storage that maintains no less than fourteen (14) days of continuous footage recorded by all cameras.

Ex. 7 (Policy, Protective Safeguards Endorsement, Section C).

A to Z breached this provision of the Policy because it failed to install, maintain, or operate a Video Surveillance System, and it never notified Kinsale that the Video Surveillance System was not present.

## Third Affirmative Defense

A to Z's claims are barred, in whole or in part, by A to Z's breach of the Policy's "Duties In The Event Of Loss Or damage" clause, which provides in part as follows:

3.  **Duties In The Event Of Loss Or Damage**

    **a.** You must see that the following are done in the event of loss or damage to Covered Property:

    **(1)** Notify the police if a law may have been broken.

    **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

    **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

    **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

    **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

    **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

    **(8)** Cooperate with us in the investigation or settlement of the claim.

12

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**\*\*\*\***

Ex. 7 (Policy, Building and Personal Property Coverage Form, Section E.3.8).

A to Z failed to comply with the foregoing provision by, among other things, submitting incomplete, inaccurate, false, misleading, and/or altered documents, information, and testimony in connection with its claim, failing to provide information and documentation, and failing to cooperate with Kinsale investigation of the claim.

## Fourth Affirmative Defense

A to Z's claims are barred, in whole or in part, by A to Z's breach of the Policy's Concealment, Misrepresentation or Fraud provision, which states:

If the Insured shall make any material misrepresentation or conceal facts either before or after a loss or make a claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void, and all claims hereunder shall be forfeited.

Ex. 7 (Policy, Common Conditions – Property, Paragraph 5).

A to Z violated the Concealment, Misrepresentation or Fraud provision by, among other things, submitting incomplete, inaccurate, false, misleading, and/or altered documents, information, and testimony in connection with its claim.

## Fifth Affirmative Defense

A to Z's claims are barred because Kinsale has already paid A to Z the full amount owed for its loss, based on the information and documents A to Z provided to Kinsale during the investigation of its claim.

## Sixth Affirmative Defense

A to Z's claims are barred, in whole or in part, by the doctrine of unclean hands, because A to Z, among other things, submitted incomplete, inaccurate, false, misleading, and/or altered

documents, information, and testimony in connection with its claim.

### Seventh Affirmative Defense

A to Z's claims are barred, in whole or in part, by the terms, conditions, limitations, and exclusions of the Policy, or to the extent A to Z has failed to satisfy its contractual obligations under the Policy.

### Reservation of Rights

Kinsale reserves the right to amend this Answer to add additional affirmative defenses, counterclaims, or third-party claims.

WHEREFORE, Kinsale requests that judgment be entered in its favor, that all claims of Plaintiff A to Z's Complaint be dismissed with prejudice, that Kinsale be awarded its attorneys fees and costs incurred in this action, and that the Court award such other and further relief as it deems just and proper.

\* \* \* \*

14

**COUNTERCLAIM FOR DECLARATORY JUDGMENT**

## I. INTRODUCTION

1. After a warehouse fire, property insurer Kinsale Insurance Company ("Kinsale") paid over $1.3 million to A to Z Wholesale, Inc. ("A to Z") for vaping products inventory A to Z claimed had been burned in the fire.

2. A to Z, which substantially increased its policy limits up to $7 million a mere 35 days before the fire, claims it is entitled to nearly $5 million more from Kinsale.

3. A to Z's claim is based on a tall tale told by a revolving cast of characters whose examination under oath testimony contradicts each other. The story involves inventory supposedly being in two places at once, millions of dollars in hard cash supposedly being lugged around, and a near total lack of customary business documentation and IRS-required documentation for large cash transactions. If A to Z truly had conducted its business using suitcases full of cash, as it claims, both A to Z and its suppliers would have engaged in substantial tax evasion by failing to report dozens of cash transactions to the IRS.

4. A to Z supports its claims with documents it admits are false.

5. A to Z created "business records" years after the fact in response to questioning from Kinsale.

6. A to Z's founder and only employee, Ibrahim Shoman, freely admitted misappropriating the payment Kinsale made to A to Z.

7. Shoman ran a competing tobacco wholesale business that he concealed from Kinsale.

8. Shoman used hundreds of thousands of dollars paid by Kinsale to support his *other* business, for himself, for a relative, and even claims to have bought $200,000 in gold rather than using the funds for anything related to A to Z.

9. Shoman spent years managing a dollar store. He had no experience as a

15

wholesaler of vaping products, or anything else.

10. Shoman was previously convicted of attempted bribery. *People v. Shoman*, 2015 IL App (1st) 133214-U.

11. Out of nowhere, Shoman went from being an unemployed former dollar store manager to purportedly having two investors giving him $4 million in physical cash to start a tobacco wholesale business, which he somehow managed to turn into more than $6 million in inventory.

12. There is no evidence that the inventory A to Z claims was in the building at the time of the fire had actually been delivered to the building that burned down. Nor are there any photographs or videos of any of that inventory.

13. The insurance policy required A to Z to have a video surveillance system operating around the clock at its facility, but the video system was conveniently never installed.

14. There are good reasons to doubt nearly every aspect of A to Z's story. But several things are clear beyond dispute.

15. First, A to Z lied in its application for the policy.

16. Second, A to Z breached the policy by not having a video system.

17. Third, Shoman repeatedly gave sworn testimony that was either false or in which he admitted conduct involving misrepresentations and concealment.

18. Finally, A to Z repeatedly provided Kinsale with documents that materially misrepresented and concealed facts, many of which it created years after the fact.

19. These undisputed facts alone are more than enough to preclude any coverage under the policy.

## II.  PARTIES

20.  Counter-Plaintiff Kinsale Insurance Company is an insurance company organized and existing under the laws of Arkansas, with its principal place of business in Richmond, Virginia.

21.  Counter-Defendant A to Z Wholesale, Inc. was a corporation organized and existing under the laws of Indiana, with its principal place of business originally in Hammond, Indiana.

22.  Eight days after the building burned down, on January 18, 2022, A to Z filed papers with the Indiana Secretary of State to change its principal office and office of its registered agent to 5415 West 5th Avenue, Gary, Indiana.

23.  A to Z was administratively dissolved by the Indiana Secretary of State on August 5, 2025.

## III.  JURISDICTION AND VENUE

24.  This Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.  Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because these counterclaims are so related to the claims brought by A to Z that they form part of the same case or controversy.

25.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff/Counter-Defendant A to Z brought its claims in this Court.

## IV.  BACKGROUND OF A TO Z

### A.  The Founding of A to Z Wholesale, Inc. and Its Multiple Addresses

26.  A to Z was incorporated in Indiana on February 7, 2021.  Shoman was the sole incorporator and the president.

17

27. According to Shoman, A to Z was a wholesaler of tobacco and vaping products. Shoman was unemployed at the time he founded A to Z. He had previously managed a dollar store for several years.

28. It its articles of incorporation filed with the Indiana Secretary of State, A to Z identified its registered office as 7315 Kennedy Avenue, Hammond, Indiana (the "Kennedy Avenue Address"). A true and correct copy of A to Z's articles of incorporation is attached hereto as **Exhibit 1**.

29. The articles of incorporation identified an email address for Noor Masoud (previously known as Noor Shukair) as the email address at which electronic service of process would be accepted.

30. On or about February 17, 2021, A to Z opened an account at Bank of America with an account number ending in x0426 (the "x0426 Account"). A true and correct copy of the first statement for the x0426 Account from February 2021 is attached hereto as **Exhibit 2**.

31. At the time the x0426 Account was opened, A to Z provided Bank of America with the Kennedy Avenue Address. *Id.*

32. Until at least January 31, 2022, the Kennedy Avenue Address remained on the x0426 Account. A true and correct copy of the January 2022 statement for the x0426 Account is attached hereto as **Exhibit 3.**

33. According to Shoman, in approximately May 2021, A to Z leased space at 6625 Columbia Avenue in Hammond, Indiana (the "Columbia Avenue Address").

34. Throughout its entire history, A to Z never made any sales.

35. Throughout its entire history, A to Z never had any purchase agreements to make future sales to any customers.

36. According to Shoman, A to Z planned to sell products over the Internet.

18

37.     But A to Z never had a website, and Shoman never contacted any web designers or IT professionals to assist in designing a website.

**B.      The Final A to Z Address in Gary, Indiana**

38.     A to Z entered into a lease agreement dated October 15, 2021 for a building located at 5415 West 5th Avenue, Gary, Indiana (the "Gary Building") that was previously occupied by an industrial services company named Industrial Pneumatics Inc.   A true and correct copy of the lease for the Gary Building is attached hereto as **Exhibit 4.**

39.     According to Articles of Dissolution filed with the Indiana Secretary of State, Industrial Pneumatics was dissolved on August 31, 2017.

40.     The lease on the Gary Building began December 1, 2021.

41.     The Gary Building was destroyed by a fire that began the night of January 10, 2022.

42.     According to Shoman, he was stacking inventory at the Gary Building until approximately 9:00 pm on January 10, 2022.  A true and correct copy of Shoman's November 23, 2022 Examination Under Oath transcript is attached hereto as **Exhibit 5.**  When he exited the building, Shoman activated a motion sensor alarm and went home. *Id.* at 34-35

43.     Shoman testified that he received an alert from the alarm company less than three hours later, just before midnight.  He did not take any action. *Id.* at 35.

44.     According to Shoman, he did not know the building was on fire until the following morning, when he arrived and saw firefighters still working to extinguish the fire. *Id.* at 36.

45.     The cause and origin of the fire was never determined.

## V.     THE KINSALE POLICY

### A.     Kinsale Issues the Policy Based on Shoman's Application, Which Was Filled With Material Misrepresentations

46.     Shoman submitted a signed application dated October 7, 2021 for A to Z to obtain commercial general liability insurance and property insurance with Kinsale.  A true and correct copy of the signed application is attached hereto as **Exhibit 6.**

47.     In signing the application for insurance, Shoman represented "that the answers are true, correct and complete to the best of his/her knowledge."  *Id.*at 8.

48.     In reality, the application contained multiple false statements.

49.     The application identified the date A to Z's business started as December 1, 2021.

50.     A to Z was incorporated February 7, 2021.

51.     The loss claimed by A to Z as a result of the fire includes millions of dollars in inventory it claims to have purchased between February 7, 2021 and November 30, 2021, a time when, according to the application, it was not in business.

52.     By misrepresenting the claimed date its business started, A to Z concealed from Kinsale the fact that it had operated for more than eight months without any insurance coverage.

53.      The application stated that A to Z had three full-time employees and two part-time employees.  *Id.* at 2.

54.     In sworn testimony on November 23, 2022, Shoman testified that A to Z never had any employees other than himself.  Ex. 5 at 14.

55.     The application stated that A to Z's annual revenues were $20 million.   Ex. 6 at 2.

56. In reality, A to Z never made any sales, never had any purchase agreements for future sales, never had a website through which online sales could be made, and never hired any web designers or other professionals to design a website. Ex. 5 at 16-18.

57. Shoman answered "yes" to the question "Is a formal safety program in operation?", and he checked boxes representing that A to Z had a safety manual and safety position, conducted monthly meetings, and complied with OSHA requirements. Ex. 6 at 3.

58. A to Z had no safety manual.

59. A to Z had no OSHA compliance procedures.

60. And—since it had no employees—A to Z had no safety director or coordinator and conducted no monthly safety meetings.

61. In reliance on the statements in the application, Kinsale issued Primary Property Policy Number 0100169032-0 (the "Policy") to A to Z for the initial policy period November 15, 2021 to November 15, 2022. A true and correct copy of the Policy, including two subsequently issued endorsements, is attached hereto as **Exhibit 7**.

62. Subject to its terms, conditions, limitations, and exclusions, the Policy originally provided coverage with limits of $5,000,000 for direct physical loss of or damage to "Stock" at the single premises described in the Declarations caused by or resulting from any Covered Cause of Loss. *Id.* at 1.

63. The Gary Building was the premises described in the Declarations. *Id.*

64. On December 6, 2021, without making a single sale, A to Z increased the limits of the Policy for damage to "Stock" from $5,000,000 to $7,000,000. *Id.* at 58-59.

**B.     The Policy Required A to Z to Maintain a Video Surveillance System**

65. The Policy states:

As a condition of this insurance, you are required to:

1.     Maintain the protective safeguards listed in the Schedule, and over which you have control, in complete working order;

21

2. Actively engage and maintain in the 'on' position at all times any automatic fire alarm or other automatic system listed in the Schedule; and

3. Notify us if you know of any suspension of or impairment in any protective safeguard listed in the Schedule. However, if part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust and Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

*Id.* (Policy, Protective Safeguards Endorsement, Section A.)

66. One of the protective safeguards listed in the Schedule that the Policy's Protective Safeguards Endorsement required A to Z to maintain was a "Video Surveillance System", including related data storage services. *Id.* at 33-34 (Policy, Protective Safeguards Endorsement, Schedule.)

67. The Policy defines "Video Surveillance System" as follows:

a. Interior and exterior video cameras that are:

(1) Capable of recording in daylight and hours of darkness;

(2) Operable in all weather conditions;

(3) Functional twenty-four (24) hours a day, seven (7) days a week; and

(4) Cover all exterior doors and windows.

b. Data storage that maintains no less than fourteen (14) days of continuous footage recorded by all cameras.

*Id.* (Policy, Protective Safeguards Endorsement, Section C).

**C.** **The Policy Imposes Duties on A to Z in the Event of Loss or Damage**

68. The Policy contains a "Duties In The Event Of Loss Or damage" clause, which provides in part as follows:

**3.** **Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

22

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage . . .

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

*Id.* at 13 (Policy, Building and Personal Property Coverage Form, Section E.3.8.).

### D. The Policy Prohibits Concealment, Misrepresentation and Fraud

69. The Policy contains a Concealment, Misrepresentation or Fraud provision, which states:

> If the Insured shall make any material misrepresentation or conceal facts either before or after a loss or make a claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void, and all claims hereunder shall be forfeited.

*Id.* at 30 (Policy, Common Conditions – Property, Paragraph 5.).

70.     The Policy was cancelled effective March 17, 2022 after A to Z failed to pay the required premium to maintain the Policy in force. *Id.* at 60.

## VI.     A TO Z'S CLAIM

### A.     A to Z Submits a Claim Immediately After the Fire

71.     Shoman reported a claim to his insurance agent on January 11, 2022, the same day the fire was extinguished, and the agent provided notice of the claim to Kinsale that afternoon.

72.     Kinsale retained an outside adjuster, who conducted an initial inspection of the Gary Building the following day.  Kinsale also retained a fire investigator.

73.     The adjuster, fire investigator, and Shoman met at the Gary Building on January 17, 2022 for a complete inspection of the property. A true and correct copy of the adjuster's report is attached hereto as **Exhibit 8.**

74.     Shoman later advised the state fire marshal that there were 70 skids or pallets of tobacco products in the building at the time of the fire. A true and correct copy of the State Fire Marshal Incident Report dated January 10, 2022 is attached hereto as **Exhibit 9**. *Id.* at 33.

75.     Photographs taken during the January 17, 2022 inspection show some remnants of tobacco and smoking products in the debris. *Id.* at 34.

76.     A small amount of individual smoking products, such as single vape pens and single butane refill cans, were scattered throughout the debris field. *Id.* at 23-24.

77.     The photographs show no apparent remnants of pallets, shelving units, crates, or warehousing equipment, such as forklifts or pallet jacks, in the debris field. *Id.* at 46-50.

78.     The burned building contained a very large quantity of charred paperwork from Industrial Pneumatics.  Numerous stacks of partially burned work orders and other paperwork dating back to at least 2004 were found within the burned out building. *Id.* at 18-19, 40-45.

79. Although Industrial Pneumatics had gone out of business by 2017, its sign was still outside the building. *Id.* at 8.

80. Despite the Policy's Protective Safeguards Endorsement requiring interior and exterior video cameras operating 24 hours a day, A to Z failed to install any video cameras at the Gary Building. *Id.* at 29.

81. There is no photographic evidence of what was in the building before the fire.

82. There is no video evidence of what was in the building before the fire.

83. There is no video evidence of how the fire started.

84. If A to Z had complied with the Protective Safeguards Endorsement and installed a video surveillance system, there would be video evidence of the product in the building.

85. If A to Z had complied with the Protective Safeguards Endorsement and installed a video surveillance system, there could be video evidence of the source or cause and origin of the fire.

**B.      A to Z's First Inventory List Raises Questions**

86. On February 5, 2022, Shoman emailed Kinsale an inventory list showing $3,482,776.05 in inventory, and images of invoices from what he claimed were three suppliers: American Distributors LLC ("American Distributors"), American Green Smoke Wholesale, Inc. ("AGS"), and HS Wholesale. There was also a single invoice from Chicago Import, Inc. A true and correct copy of Shoman's February 5, 2022 email is attached hereto as **Exhibit 10**.

87. According to sworn testimony later given by Shoman, the inventory list provided to Kinsale was prepared by an outside bookkeeper, Abdo Halawa. Ex. 5 at 55.

88. According to sworn testimony later given by Halawa, Shoman gave him paper copies of invoices, which Halawa compiled into a spreadsheet. A true and correct copy of Halawa's Examination Under Oath transcript is attached hereto as **Exhibit 11.**

25

89. Halawa never visited the warehouse, never saw any of the inventory, never saw any photographs of any of the inventory, and never contacted any of the vendors to verify the purchases. *Id.* at 11-13.

90. The sole source of information on which Halawa relied to prepare the inventory spreadsheet was the hard copy invoices Shoman provided him. *Id.* at 13-14.

91. Halawa did not complete his inventory until late January 2022. *Id.* at 12.

92. A to Z's attorney, Paul Poracky, would later explain that Halawa's inventory only included invoices through December 15, 2021.

93. Shoman also provided post-December 15, 2021 invoices to Kinsale purporting to show dramatically higher purchase amounts than in previous months.

94. The post-December 15 invoices inexplicably were not provided to A to Z's bookkeeper, Halawa.

95. Among the post-December 15, 2021 invoices Shoman provided to Kinsale were 12 individual invoices for purchases exceeding $100,000 from AGS or HS Wholesale. A true and correct copy of the 12 individual invoices from AGS or HS Wholesale are attached hereto as **Exhibit 12**.

96. The adjuster contacted Shoman to request monthly profit and loss statements for A to Z, as well as documentation for sales made after the date of the inventory report.

97. Shoman informed the adjuster that A to Z had no profit and loss statements and that it had never made any sales in its entire history.

98. The vast majority of the invoices provided by A to Z identified a shipping address as the Kennedy Avenue Address rather than the Gary Building. A true and correct copy of individual invoices reflecting the Kennedy Avenue address are attached hereto as **Exhibit 13**.

26

99. In most cases, the invoices did not reflect proof that A to Z paid for the items. Ex. 12.

100. The adjuster made a follow-up request for information to Shoman for proof that inventory had been paid for and delivered to the Gary Building.

**C. March 2022: A to Z Cannot Substantiate the Purchase or Location of Inventory**

101. On March 16, 2022, Shoman provided a written narrative and some additional documents in response to the adjuster's requests. A true and correct copy of Shoman's March 16, 2022 narrative is attached hereto as **Exhibit 14.**

102. Regarding the location of A to Z's business, Shoman's narrative explained that he entered into a lease for the Kennedy Avenue Address in January 2021, but that "I never operated a business out of that building." Ex. 14 at 1.

103. Shoman's narrative explained that he entered into a month-to-month lease for the Columbia Avenue Address in May 2021, and "The product stored at 7315 Kennedy was delivered to 6625 Columbia after I entered into that lease in May, 2021." *Id.*

104. Shoman's narrative continued: "On December 14-16, 2021, the product at 6625 Columbia was delivered to the Gary building [the Gary Building] that had the fire." *Id.*

105. Shoman provided no documents or explanation for what was moved from the Kennedy Avenue Address to the Columbia Avenue Address in May 2021.

106. Shoman's statement that "I never operated a business out of that building [the Kennedy Avenue Address]" directly contradicts A to Z's filings with the Indiana Secretary of State, A to Z's bank account records, and most of the invoices submitted by Shoman, all of which identify the Kennedy Avenue Address as the location of A to Z's business and the delivery location.

107. Shoman provided the adjuster with a one-page invoice from a trucking company for $8,300 for "Transport and Delivery Service (W/Helper)" on December 14-16, 2021, and a

check for $8,300 with "cash after 30 days" written in the memo line. A true and correct copy of the trucking invoice and check Shoman provided are attached hereto as **Exhibit 15**.

108. The invoice was from Shoman's cousin's trucking company—Samir Saleh. A true and correct copy of the examination under oath of Saleh is attached as **Exhibit 16**. *Id.* at 1, 9.

109. Shoman testified that the invoice reflected when and how A to Z moved the stock. Ex. 5 at 46-47.

110. The one-page invoice and the check copy were the only documentation A to Z ever provided to support that any inventory was delivered to the Gary Building. *See* Ex. 15.

111. Neither A to Z nor the trucking company prepared a bill of lading, inventory list, or written estimate. Ex. 16 at 28-29.

112. Neither A to Z nor the trucking company prepared any other documents typically generated in connection with a commercial move.

113. The receipt provided no details regarding the types or quantity of items transported, how many hours the job took, or how the $8,300 price was determined. *See* Ex. 15.

114. Despite his March 16, 2022 statement that A to Z moved all of its inventory from the Kennedy Avenue Address to the Columbia Avenue Address in May 2021, Shoman later gave sworn testimony that, in December 2021, inventory was moved from both addresses to the Gary Building. Ex. 5 at 39-44.

115. In other words, Showman contradicted himself because he said both that there was nothing left at the Kennedy Avenue Address and that he moved product from the Kennedy Avenue Address to the Gary Building.

116. In response to the adjuster's question about why the Kennedy Avenue Address was identified as the shipping address on most of the invoices, Shoman wrote: "Produce [sic]

28

was never delivered to the 7315 Kennedy location. I picked it up with my truck from the distributors." Ex. 14 at 1.

117.    To support his contention that he personally picked up all of the products, Shoman provided two short and very similar letters he said were from two of his suppliers. True and correct copies of those letters are attached hereto as **Exhibit 17.**

118.    One letter, purportedly from American Green Smoke Wholesale Inc., stated: "To whom it may concern: This letter is to inform that 'A To Z Wholesale Inc' always pick-up their own order from American Green Smoke Wholesale Inc." *Id.* at 2.

119.    The other letter, purportedly from American Distributors, stated: "To whom It may concern: This is to inform that our Customer A to Z Wholesale Inc always pick their order from the warehouse located in Bensenville IL. Please let me know if additional information is needed." *Id.* at 1.

120.    In other words, instead of having any normal shipping documentation like a bill of lading, A to Z claimed that two separate distributors coincidentally wrote nearly identical letters with identical grammar errors ("A to Z Wholesale always pick up...").

121.    In response to the adjuster's request for support, such as cancelled checks or credit card/bank statements, showing the invoices were paid, Shoman provided copies of account statements for the x0426 Account from February 2021 through December 2021. True and correct copies of the x0426 Account statements Shoman provided are attached hereto as **Exhibit 18.**

122.    The February 2021 through December 2021 account statements show less than $40,000 in debit card transactions with potential suppliers. *Id.* at 1-55.

123.    Shoman did not provide the adjuster with any cancelled checks, credit card receipts, or other proof of payment for any inventory.

124. Shoman did not do so despite claiming A to Z had more than $5 million in inventory.

**D.     July – November 2022: Kinsale Demands Shoman Testify Under Oath**

125. Kinsale sent Shoman a letter dated July 6, 2022, exercising its right under the Policy to conduct an Examination Under Oath ("EUO").

126. The EUO took place on November 23, 2022. Shoman's testimony was given under oath, and the testimony was transcribed by a court reporter.

127. In connection with its request for an EUO, Kinsale requested additional documents, including any photographs or video footage of the purported inventory and the Gary Building, and documents relating to the purchase, payment, transportation, and delivery of the claimed inventory.

128. A to Z retained attorney Paul Poracky and, in October 2022, submitted several additional documents in advance of the EUO.

**E.     A to Z Falsely Documents its Dealings With its Investors**

129. A to Z submitted affidavits from what it said were two investors in its business—Samir Saleh and Abdelrhman Ibrahim Karakra . True and correct copies of those affidavits are attached hereto as **Exhibit 19** (Saleh) and **Exhibit 20** (Karakra).

130. According to the affidavits, both investors provided their investments entirely in physical cash. Ex. 19 at 2; Ex. 20 at 2.

131. Samir Saleh was also the owner of the trucking company that supposedly moved A to Z's inventory in December 2021.

132. Saleh's affidavit provided no further details or documentation about the move. *See* Ex. 19.

133. Saleh's affidavit stated that he had provided Shoman with $1 million in cash to assist with his business. *Id.* at 2.

134. Karakra's affidavit stated that he had loaned Shoman $3 million in cash in the summer of 2021. Ex. 20 at 3.

135. Karakra's affidavit further stated that Karakra would have considered loaning Shoman an additional $4 million depending on how the business went. *Id.*

136. A to Z also provided Kinsale with two documents it claimed memorialized the agreement between Shoman and Karakra.

137. The first document was a promissory note between Karakra and A to Z. A true and correct copy of the promissory note is attached hereto as **Exhibit 21.**

138. The promissory note with Karakra states: "A to Z Wholesale Inc. acknowledges receipt of the payment of $7,000,000 on March 1, 2021." *Id.* at 1.

139. The second document purported to be a "partnership agreement." A true and correct copy of the partnership agreement is attached hereto as **Exhibit 22.**

140. The partnership agreement states that Karakra had invested $7 million in A to Z on March 1, 2021 in exchange for 20% of the equity in A to Z—a tobacco business that had never made a single sale. *Id.* at 1-2.

141. If 20% of A to Z was worth $7 million, then it would stand to reason that 100% of A to Z (an amount five times greater than 20%) would be worth $35 million (an amount five times greater than $7 million)—despite the company having no sales, no website, and no employees.

142. The partnership agreement identified A to Z as an Illinois limited partnership. *Id.* at 1.

143. A to Z was an Indiana corporation that had been formed the month before the date on the partnership agreement.

144. Karakra later testified that the partnership agreement and the promissory note were inaccurate. A true and correct copy of Karakra's EUO transcript is attached hereto as **Exhibit 23.** *Id.* at 14-16, 22, 26, 29-30.

145. Karakra testified that he never provided Shoman or A to Z with $7 million. *Id.* at 26, 29.

146. Karakra testified that he lent Shoman approximately $3.1 million. *Id.* at 16, 26.

147. Karakra also testified that he provided the money in installments. *Id.* at 18-22.

148. Although Karakra had no record of exactly how much money he gave Shoman or when he provided those funds, he testified that there were more than 10 installments, the largest of which was about $150,000. *Id.* at 21-22.

149. Karakra testified that he did not disclose anything about his multi-million dollar investment in A to Z on his 2021 or 2022 tax returns. *Id.* at 17.

150. So A to Z and Karakra collectively advised Kinsale that Karakra gave Shoman $3 million, $3.1 million, or $7 million, all in cash, for a new business that never made a single sale, never had a website, and mysteriously burned down shortly after it purchased a large property insurance policy.

### F. Shoman Conceals His Operation of a Competing Tobacco Wholesale Business

151. During his EUO in November 2022, Shoman testified he was employed as a manager for a home goods store. Ex. 5 at 11-12.

152. Shoman testified that his previous employment was with A to Z. *Id.* at 12.

153. Shoman further testified that before working for A to Z, he ran a dollar store. *Id.* at 13.

154. Shoman's testimony about his employment was false.

155. Shoman failed to disclose in his November 2022 EUO that he had started a new vaping business, Everything Vape Wholesale, in July 2022—just a few months after the fire burned the Gary Building.

156. As discussed in greater detail below, Kinsale only became aware of the other vaping business when it received an anonymous tip disclosing the other business and warning Kinsale that A to Z's claim was fraudulent.

157. During his EUO, Shoman testified that all products purchased from American Distributors, AGS, and HS Wholesale were exclusively for A to Z's business.

158. In particular, Shoman gave the following testimony:

Q. With American Distributors LLC, were all of the products purchased for A to Z's business, or were any products purchased for any other purpose?

A. All for A to Z.

Ex. 5 at 51.

159. Shoman's testimony was false.

160. As Kinsale would later discover, Shoman purchased products for his other vaping business from some of the same vendors.

161. In particular, Shoman later provided Kinsale with purchase orders for Everything Vape Wholesale from American Distributors that were dated prior to his EUO on November 23, 2022. True and correct copies of purchase orders between Everything Vape Wholesale and American Distributors are attached hereto as **Exhibit 24.**

162. After Kinsale paid A to Z's claim on or around December 6, 2023, Shoman used part of the proceeds to pay vendors of Everything Vape Wholesale and to repay an investor in Everything Vape Wholesale.

**G. A to Z Claims Massive Amounts of All-Cash Transactions**

163. Among the documents A to Z provided were what it claimed were customer journals from American Distributors, AGS, and HS Wholesale showing millions of dollars of transactions settled in cash.

164. A to Z also provided two affidavits from American Distributors and AGS claiming that A to Z typically paid in cash. True and correct copies of affidavits from American Distributors and AGS are attached hereto as **Exhibit 25**.

165. Shoman testified that all $4 million he received from Saleh and Karakra for their investments in A to Z was provided as physical cash. Ex. 5 at 25-26.

166. Shoman testified that A to Z had the x0426 Account at Bank of America, but he testified that he did not deposit any portion of the $4 million in cash into the x0426 Account. *Id.* at 26.

167. Shoman testified that A to Z did not use any other bank account besides the x0426 Account. *Id.*

**H. December 2022 – January 2023: Kinsale Seeks Financial and Tax Records to Corroborate the Extensive Cash Transactions**

168. Following Shoman's EUO, Kinsale sent a new request for financial records, tax documents, inventory records, or documents relating to the loans from the two investors.

169. On December 29, 2022, A to Z's attorney, Poracky, sent a letter stating that A to Z had no financial records, tax returns, or loan and inventory documents beyond what had already been provided. A true and correct copy of the December 29, 2022 letter is attached hereto as **Exhibit 26.**

170. Poracky provided a compilation of the post-December 16, 2022 invoices that had previously been produced. When combined with the pre-December 16, 2022 inventory totals, the grand total amount of lost inventory claimed by A to Z was $6,252,847.71. *Id.* at 1.

171.    On January 11, 2023, A to Z's attorney emailed Kinsale a promissory note dated June 24, 2021, for a $1 million loan from Saleh to Shoman, as President of A to Z.  A true and correct copy of the Saleh promissory note is attached hereto as **Exhibit 27.**

172.    The $6,252,847.71 claimed inventory loss exceeded by more than $2 million the amount of money A to Z claimed to have received from its two investors.

173.    Because A to Z never made any sales, even if A to Z did receive $4 million in physical cash from its investors, it would have been impossible for A to Z to acquire $6,252,847.71 in inventory with only $4 million in capital.

174.    A to Z claimed to have made millions of dollars of all-cash transactions, despite having a business bank account it easily could have used, both for the safekeeping of money and to create customary business records required for accounting and tax purposes.

175.    A to Z claims to have made 15 cash purchases of inventory exceeding $100,000, with the largest cash purchase in the amount of $240,668.40.  True and correct copies of those 15 invoices are attached hereto as **Exhibit 28.**  Although the invoices identified "Chase QuickPay" as the method of payment, as discussed below, A to Z would later deny even banking with Chase or using Chase QuickPay (*see* ¶ 324), would provide affidavits from its distributors saying A to Z typically paid  in cash (*see* ¶ 164), and would provide an email advising that A to Z received invoices listing Chase QuickPay as the payment method when that was not accurate.  A true and correct copy of a June 23, 2023 email from Mr. Shoman is also attached as part of **Exhibit 28**.

I.    **The Internal Revenue Code <u>Requires</u> Prompt Reporting of Cash Transactions**

176.    According to the IRS:

> Generally, if you're in a trade or business and receive more than $10,000 in cash in a single transaction or in related transactions, you must file Form 8300.

> The Form 8300, Report of Cash Payments Over $10,000 in a Trade or Business, provides valuable information to the Internal Revenue Service and the Financial Crimes Enforcement Network (FinCEN) in their efforts to combat money laundering. Money is 'laundered' to conceal illegal activity, including the crimes that generate the money itself, such as drug trafficking, tax evasion and terrorist financing.

*Form 8300 and reporting cash payments of over $10,000*, IRS (July 24, 2025), https://www.irs.gov/businesses/small-businesses-self-employed/form-8300-and-reporting-cash-payments-of-over-10000.

177. Section 6050I(a) of the Internal Revenue Code, 26 U.S.C. § 6050I(a), and its associated regulation, 26 C.F.R. § 1.6050I-1, require any person "engaged in a trade or business" to report to the IRS on Form 8300 the receipt of "more than $10,000 in cash in 1 transaction (or 2 or more related transactions)."

178. Form 8300 requires the disclosure of the name, address, and taxpayer identification number of the person from whom the cash was received, the date and nature of the transaction, and the amount of cash received.

179. Form 8300 must be filed within 15 days after receipt of the payment, and the business is required to notify the customer that a Form 8300 was filed and retain a copy of the Form 8300 for five years.

180. Cash transactions for which a Form 8300 filing requirement is implicated "include, (but are not limited to) a sale of goods or services . . . or the making or repayment of a loan." 26 C.F.R. § 1.6050I-1(c)(7).

181. Failure to file a Form 8300 may result in a civil penalty of $250 for *each* failure to file a report, up to a maximum of $3 million. 26 U.S.C. § 6721.

182. If the failure to file a Form 8300 is intentional, the civil penalty for *each* violation is the greater of $25,000 or the amount of cash that was received and required to be reported (up to $100,000). 26 U.S.C. § 6721.

183.     Willful failure to file a Form 8300 is a felony, punishable by imprisonment of up to five years and/or a fine of up to $25,000 for individuals or $100,000 for corporations.  26 U.S.C. § 7203.

**J.      Kinsale Demands A to Z Provide Tax Documentation for Cash Purchases It Claimed to Have Made <u>and</u> Cash Investments It Claimed to Have Received**

184.     If A to Z really did make large cash purchases of inventory from its suppliers, then the suppliers were required to report every single instance in which A to Z provided them with more than $10,000 in cash to the IRS, and notify A to Z of the filing.

185.     Likewise, if A to Z really did receive large amounts of cash from its purported investors, A to Z was required to report every single instance in which it received more than $10,000 in cash to the IRS and notify the investor of the filing.

186.     According to the invoices that A to Z provided, and its denial that any payments were made via Chase QuickPay, there were 54 instances in which American Distributors, AGS, or HS Wholesale received cash payments of more than $10,000 from A to Z.

187.     A Form 8300 and a notice to A to Z of filing the Form 8300 was required for *each one* of those 54 transactions.

188.     The earliest cash purchase claimed by A to Z that would have required the filing of a Form 8300 was a $17,588 purchase from American Distributors on June 23, 2021.  A true and correct copy of the June 23, 2021 invoice is attached hereto as **Exhibit 29.**

189.     The Form 8300 for a cash transaction on June 23, 2021 was due July 8, 2021.

190.     The latest cash purchases claimed by A to Z that would have required the filing of Forms 8300 were on January 3 and 4, 2022.

191.     A to Z claims to have made $296,411.20 in cash purchases on January 3 and 4, 2022.  True and correct copies of the January 3 and 4, 2022 invoices are attached hereto as **Exhibit 30.**

192. A to Z claimed to make a $123,086.20 cash purchase from AGS on January 3, 2022, and a $173,325 cash purchase from AGS on January 4, 2022. *Id.* at 1-2.

193. The Forms 8300 for cash transactions on January 3 and 4, 2022 were due January 18 and 19, 2022, respectively.

194. The vendors were required to notify A to Z of each Form 8300 they filed.

195. Both the Saleh loan and the Karakra loan were subject to the filing requirements of 26 U.S.C. § 6050I.

196. A to Z was required to file a Form 8300 *each time* it received an installment of more than $10,000 in cash from one of its investors.

197. Accordingly, on January 24, 2023, Kinsale sent A to Z a follow-up request for documents, in which it sought copies of any Forms 8300 prepared or submitted to the IRS for A to Z or any of its investors, and copies of any notices of Forms 8300 received from any suppliers. A true and correct copy of Kinsale's January 24, 2023 letter is attached hereto as **Exhibit 31.**

198. Kinsale also requested copies of tax returns for A to Z or Shoman identifying the promissory notes, and any other financial records evidencing the amount and value of the claimed damages, such as tax records or balance sheets.

199. If the Forms 8300 were not filed by A to Z for each cash investment of more than $10,000 purportedly received from its investors, then one of two things must be true— either A to Z committed major tax evasion, or those cash investments were never actually made.

200. If A to Z did not receive notice from its suppliers for each of the 54 cash purchases over $10,000 it claims to have made from them, then one of two things must be true—either three different suppliers each separately committed major tax evasion, or those cash purchases were never actually made.

**K.    A to Z Did Not Have Any of the Required Tax Records**

201.    A to Z did not respond to the requests for information for several weeks, even as Kinsale sent multiple follow-up reminders.

202.    At the time Kinsale made its document request on January 24, 2023, A to Z did not have the records requested by Kinsale.

203.    In order to respond to Kinsale's document requests, A to Z created new documents after January 24, 2023.

204.    A to Z responded to Kinsale's January 24, 2023 document request by producing documents that were created after January 24, 2023.

**L.    March 2023: A to Z Fabricates Business Records to Provide to Kinsale**

205.    In March 2023, Kinsale received notice of an attorneys' lien from a tax attorney, Hani Khatib of Khatib Law, LLC.  A true and correct copy of the attorneys' lien and retainer agreement is attached hereto as **Exhibit 32.**

206.    Included with the notice was a March 8, 2023 retainer agreement signed by Shoman on behalf of A to Z.  *Id.*

207.    The attorney's lien was based on a contingency fee, calculated by the amount recovered from Kinsale. *Id.* at 1.

208.    On March 15, 2023, Poracky, counsel for A to Z, emailed Kinsale what he described as "unaudited financial statements, 2021 and 2022 corporate tax returns, and form 8300s that Kinsale has requested."  A true and correct copy of the March 15, 2023 email is attached hereto as **Exhibit 33.**

209.    Attached to the March 15, 2023 email were: (1) an unsigned and undated 2021 federal tax return for A to Z, (2) unsigned and undated 2022 federal and Indiana tax returns for A to Z, (3) unaudited financial statements dated March 9, 2023 for A to Z for the years ended December 31, 2021 and December 31, 2022, and (4) *three* unsigned Forms 8300 dated March

8, 2023.  A true and correct copy of the unaudited financial statements is attached hereto as **Exhibit 36**.  Kinsale will be filing a forthcoming motion to file true and correct copies of the tax documents under seal as **Exhibits 34, 35,** and  **37.**

210.    A to Z did not provide Kinsale with *any* notices of filing of Form 8300 received by A to Z from any of the suppliers for any of the 54 instances in which A to Z claimed they received more than $10,000 in cash from A to Z.

211.    The tax returns and financial statements were prepared by the same tax attorney who had sent the attorney's lien to Kinsale.  Ex. 34 at 1; Ex. 35 at 1; Ex. 36 at 1.

212.    The documents attached to the March 16, 2023 were not, in fact, what Kinsale had requested.

213.    Kinsale's document requests to A to Z sought *existing* business records to substantiate A to Z's claimed losses.

214.    Kinsale never requested that A to Z create *new* business records to provide to Kinsale.

215.    In addition to being created long after the fact, the documents provided by A to Z on March 16, 2023 contained materially false information.

**M.    The 2021 Financial Statements Were False**

216.    The 2021 Financial Statements consisted of a balance sheet and profit and loss statement. Ex. 36 at 2, 4.

217.     The balance sheet falsely identified A to Z as having total assets of $9,700,904.81 as of December 31, 2021. *Id.* at 2.

218.    A to Z never had total assets of $9.7 million.

219.    A to Z never had total assets anywhere close to $9.7 million.

220.    The balance sheet identified as a current asset "Line of Credit Abdelrhman Karak[ra]" with a balance of $4,060,129.36.  *Id.* at 2.

221. Karakra testified that he never provided a line of credit to A to Z. Ex. 23 at 29-32.

222. The balance sheet identified as a current liability "Promissory Note Abdelrhman Kara[kra]" with a balance of $7,000,000. Ex. 36 at 2.

223. As discussed above, the promissory note falsely stated that Karakra provided A to Z with $7,000,000 on March 1, 2021.

224. Shoman admitted in his EUO in November 2022 that Karakra only provided $3 million to A to Z. Ex. 5 at 23.

225. Shoman knew when the balance sheet was prepared in March 2023 that Karakra had not provided A to Z with $7,000,000.

226. In addition to the $7 million Karakra promissory note and the $1 million Saleh promissory note, the 2021 balance sheet also identified an additional $1,618,728.89 in "Contributed Capital." Ex. 36 at 2.

227. No one contributed $1,618,728.89 in capital to A to Z.

228. Neither the partnership agreement nor any other document provided by A to Z identified any capital contribution by Shoman to A to Z.

229. Had Shoman made any capital contributions, the partnership agreement required Karakra to contribute additional funds of his own, or the allocation of profits and losses among the partners to be adjusted.

## N.     The 2022 Financial Statements Were False

230. The 2022 Financial Statements consisted of a balance sheet and profit and loss statement. *Id.* at 3, 5.

231. The balance sheet falsely identified A to Z as having total assets of $3,877,237.06 as of December 31, 2022. *Id.* at 3.

41

232. Almost the entire amount of those assets came from a "Line of Credit Abdelrhman Karak[ra]" with a balance of $3,875,054.62. *Id.*

233. The balance of the non-existent line of credit as of December 31, 2022 was stated differently than the stated balance as of December 31, 2021. *Id.* at 2-3.

234. Because the line of credit never existed, A to Z did not draw down a non-existent line of credit between December 31, 2021 and December 31, 2022.

235. The balance sheet identified as a current liability "Promissory Note Abdelrhman Kara[kra]" with a balance of $7,000,000. *Id.* at 3.

236. As discussed above, the promissory note falsely stated that Karakra provided A to Z with $7,000,000 on March 1, 2021. Ex. 23 at 29-30.

237. Shoman admitted in his EUO in November 2022 that Karakra only provided $3 million. Ex. 5 at 23.

238. When the balance sheet was prepared in March 2023, Shoman knew that Karakra had not provided A to Z with $7,000,000.

239. In addition to the $7 million Karakra promissory note and the $1 million Saleh promissory note, the 2022 balance sheet also identified an additional $2,116,402.27 in "Contributed Capital." Ex. 36 at 3.

240. No one contributed $2,116,402.27 in capital to A to Z.

241. The Contributed Capital amount as of December 31, 2022 was $497,673.38 greater than the Contributed Capital amount as of December 31, 2021. *Id.* at 2-3.

242. No one contributed $497,673.38 in capital to A to Z between the foregoing dates.

243. The terms of the partnership agreement would have prohibited such a contribution without, at a minimum, the unanimous consent of all partners. Ex. 22 at 1-2.

244.    The 2022 profit and loss statement identified a loss of $6,537,854.70 for Cost of Goods Sold.  Ex. 36 at 5.

245.    Because A to Z had no sales in either 2021 or 2022, the $6,537,854.70 figure purportedly represented the amount of inventory purportedly lost in the fire.

246.    The Cost of Goods Sold figure in the 2022 profit and loss statement did not match the claimed loss amount provided by A to Z's attorney on December 29, 2022.  Ex. 26 at 1; Ex. 36 at 3, 5.

**O.      The 2021 Tax Return Was False**

247.    The 2021 federal tax return provided by A to Z was not signed, and there was no proof that it was filed with the IRS.  Ex. 34.

248.    The 2021 federal tax return identified A to Z's address as the Kennedy Avenue Address.  Ex. 34 at 1.

249.    On Line 6 of Schedule L of Form 1120-S, the 2021 tax return identified $4,060,129 in "Other current assets." *Id.* at 4.

250.    The current asset identified on that line was the purported line of credit from Karakra, which never existed.  *Id.*; Ex. 36 at 2.

251.    On Line 15 of Schedule L of Form 1120-S, the 2021 tax return identified $9,700,904 in "Total assets".  Ex. 34 at 4.

252.    A to Z never had $9,700,904 in Total assets.

253.    On Line 21 of Schedule L of Form 1120-S, the 2021 tax return identified $8,000,000 in "Other liabilities." *Id.*

254.    The other liabilities identified on that line were the Karakra and Saleh promissory notes.  *Id.*; Ex. 21 at 1; Ex. 27 at 1.

255.    Both Karakra and Shoman testified Karakra never lent A to Z $7,000,000, as stated in the promissory note and later in the 2021 tax return.  Ex. 5 at 23; Ex. 23 at 26, 29.

43

256. On Line 23 of Schedule L of Form 1120-S, the 2021 tax return identified $1,618,728 in "Additional paid-in capital." Ex. 34 at 4.

257. No one contributed $1,618,728.89 in capital to A to Z.

258. On Schedule K-1 of Form 1120-S of the 2021 tax return, Shoman was identified as the 100% shareholder of A to Z. *Id.* at 7.

259. That entry directly contradicts the partnership agreement, which states that Shoman is an 80% owner of A to Z, with Karakra owning the remaining 20%. Ex. 22 at 2.

**P. The 2022 Tax Return Was False**

260. The 2022 federal tax return provided by A to Z was not signed, and there was no proof that it was filed with the IRS. Ex. 35 at 1.

261. Both the 2022 federal and Indiana state tax returns identified A to Z's address as the Kennedy Avenue Address. *Id.* at 1, 16.

262. On Line 6 Schedule L of Form 1120-S, the 2022 tax return identified $3,875,055 in "Other current assets" at the end of the tax year, down from $4,060,129 at the beginning of the tax year. *Id.* at 4.

263. The current asset identified on that line was the line of credit from Karakra. *Id.* at 4; Ex. 36 at 3.

264. The non-existent Karakra line of credit did not change in value during the 2022 tax year. Ex. 36 at 3.

265. On Line 15 of Schedule L of Form 1120-S, the 2022 tax return identified $3,877,237 in "Total assets" at the end of the tax year, down from $9,700,904 at the beginning of the tax year. Ex. 35 at 4.

266. A to Z did not have $3,877,237 in total assets at the end of 2022.

267. On Line 21 of Schedule L of Form 1120-S, the 2022 tax return identified $8,000,000 in "Other liabilities." *Id.*

268. The other liabilities identified on that line were the Karakra and Saleh promissory notes. *Id.*; Ex. 21 at 1; Ex. 27 at 1.

269. Both Karakra and Shoman testified Karakra never lent A to Z $7,000,000, as stated in the promissory note and later in the 2022 tax return. Ex. 5 at 23; Ex. 23 at 26, 29.

270. On Line 23 of Schedule L of Form 1120-S, the 2022 tax return identified $2,116,401 in "Additional paid-in capital at the end of the tax year, up from $1,618,728 at the beginning of the tax year. Ex. 35 at 4.

271. No one contributed $497,673 in capital to A to Z during 2022.

272. On Line 2 of Form 1120-S and the accompanying Form 1125-A, the 2022 tax return identified $6,537,855 for "Cost of goods sold." *Id.* at 1.

273. Because A to Z had no sales in either 2021 or 2022, the $6,537,855 figure purportedly represented the amount of inventory A to Z claimed to have lost in the fire.

274. The Cost of goods sold figure in the 2022 tax return did not match the claimed loss amount provided by A to Z's attorney on December 29, 2022. Ex. 26 at 1; Ex. 35 at 4.

275. On Schedule K-1 of Form 1120-S of the 2022 tax return, Shoman was identified as the 100% shareholder of A to Z. Ex. 35 at 7.

276. That entry directly contradicts the partnership agreement, which states that Shoman is an 80% owner of A to Z, with Karakra owning the remaining 20%. Ex. 22 at 2.

### Q. The Few Forms 8300 That A to Z Provided Were Facially Deficient

277. A to Z was required by law to provide its investors with a Form 8300 each time those investors provided it with over $10,000 in cash, with hefty monetary penalties and years of imprisonment at stake.

278. A to Z provided Kinsale with three Forms 8300, each of which was dated March 8, 2023. Ex. 37.

279. All three Forms 8300 provided by A to Z were not signed, and there was no proof that any of them were filed with the IRS. *Id.* at 1-3.

280. Each Form 8300 was due within 15 days of the receipt by A to Z of more than $10,000 in cash.

281. Each of the Forms 8300 claimed to report a transaction more than two years before March 8, 2023. *Id.*

282. Kinsale made several follow-up requests for signed copies of the Forms 8300 with proof of filing, but those were never provided.

283. Kinsale's requests put A to Z on notice of the requirement to file Forms 8300.

284. With knowledge of the requirement to file the Forms 8300, not filing those forms would be willful.

**R. The Karakra Form 8300 Contains Material Misrepresentations**

285. The first Form 8300 stated that Karakra provided $3,120,906 to A to Z on January 10, 2022. *Id.* at 2.

286. In a subsequent EUO, Karakra testified that the Form 8300 was not correct. Ex. 23 at 18-19.

287. Shoman testified that Karakra provided A to Z with $3 million. Ex. 5 at 23.

288. Karakra testified that he provided "like 3.1 million," and that he did so over the course of several months. Ex. 23 at 16.

289. Neither Shoman nor Karakra identified the precise amount of $3,120,906 in testimony. Ex. 5 at 23; Ex. 23 at 16.

290. Karakra testified that he did not provide A to Z with any money on January 10, 2022, which was the date stated on the Form 8300, as well as the date of the fire. Ex. 23 at 18.

291. Karakra testified that he provided Shoman with money in more than ten installments. *Id.* at 18-19.

46

292.    Karakra further testified that he could not remember the dates of any of the payments, but they were all before the fire.  *Id.*

293.    A Form 8300 was required for *each instance* in which Karakra provided more than $10,000 to A to Z.

294.    But A to Z provided only a single, inaccurate Form 8300 for Karakra.

**S.      The Saleh Form 8300 Contains Material Misrepresentations**

295.    The second Form 8300 stated that Saleh provided $1,000,000 to A to Z on December 31, 2021.  Ex. 37 at 3.

296.    In a subsequent EUO, Saleh testified that the Form 8300 was not correct.  Ex. 16 at 29-30.

297.    Saleh testified that he provided $1 million in cash to A to Z in approximately five or six installments between June 2021 and November 2021.  *Id.* at 30.

298.    Saleh did not provide A to Z with any cash on December 31, 2021, which was the date stated on the Form 8300.  Ex 37 at 3; Ex. 16 at 29-30.

299.    Shoman testified that he did not know the timeline of when Saleh gave him cash, and he could not remember the terms under which Saleh gave him cash for A to Z.  Ex. 5 at 21-22.

300.    After Shoman's first EUO was complete, A to Z's attorney, Poracky, provided Kinsale with a promissory note dated June 24, 2021 under which Shoman agreed to repay $1 million and pay Saleh 20% of A to Z's profits.  Ex. 27.

301.    A Form 8300 was required for *each instance* in which Saleh provided more than $10,000 to A to Z.

302.    But A to Z provided only a single, inaccurate Form 8300 for Saleh.

### T. The Shoman Form 8300 Contains Material Misrepresentations

303. The third Form 8300 stated that A to Z had received $2,158,523 from Shoman on January 10, 2022, which was the day of the fire. Ex. 37 at 1.

304. The invoices provided by A to Z do not show anything close to $2,158,523 in inventory purchases on January 10, 2022. A true and correct copy of the only January 10, 2022 invoice provided by A to Z is attached hereto as **Exhibit 38.**

305. If A to Z had in fact received those funds on January 10, 2022, it would still have had the cash after the fire.

306. The only cash shown on A to Z's 2022 balance sheet was a $162.50 bank account balance. *Id.* at 3.

307. Shoman never contributed $2,158,523, or any amount close to $2,158,523 in cash to A to Z.

### U. March – July 2023: Kinsale Demands Required Tax Documents

308. The contradictory and backdated business and tax records, and the millions of dollars in purported cash transactions that continued to be unexplained and undocumented provided by A to Z raised far more questions than they answered.

309. On March 21, 2023, Kinsale requested signed copies of the tax documents A to Z provided, along with proof that those documents had been filed with the IRS. A true and correct copy of the March 21, 2023 letter is attached hereto as **Exhibit 39.**

310. A to Z responded by sending signed copies of the 2021 and 2022 returns and the three Forms 8300, but it failed to provide any proof of filing for any of those documents.

311. After another follow-up request for proof of filing with the IRS, A to Z provided two electronic confirmations showing that a 2021 federal return and a 2022 Indiana return were filed. True and correct copies of those two confirmations are attached hereto as **Exhibit 40.**

48

312. According to the confirmations, both returns were filed on March 21, 2023. *Id* at 1, 27-30.

313. March 21, 2023 is the day Kinsale requested proof the documents had been filed with the IRS. Ex. 39.

314. A to Z never provided any proof of filing for the 2022 federal return to Kinsale.

315. A to Z never provided any proof of filing for the Forms 8300 to Kinsale.

316. Kinsale also requested copies of any additional inventory or bank records to support A to Z's claims that the inventory had been paid for and delivered to the Gary Building.

317. In particular, Kinsale requested of any Chase bank account records.

318. Most of the HS Wholesale invoices identified the Payment Method as "Pay Via Chase QuickPay ([amount of invoice])." Ex. 12 at 1,3, 5, 7.

319. If payments were made by Chase QuickPay, there would be an electronic trail that would substantiate or refute A to Z's claims that it paid for the inventory.

320. Kinsale also requested an EUO of Noor Masoud, whose email address appeared on the HS Wholesale invoices.

321. A to Z provided a letter from Masoud, which stated that she was a friend of Shoman and had helped him register the companies. A true and correct copy of the letter from Masoud is attached hereto as **Exhibit 41.**

322. The letter stated that she helped him sign up for an account with HS Wholesale and listed her email address as a point of contact, but that was the extent of her involvement. *Id.*

323. On May 23, 2023, A to Z's counsel provided Kinsale with a .pdf file containing twenty-eight pages of images of checks and cashier's checks associated with the x0426 Account. A true and correct copy of the May 23, 2023 .pdf file (with redactions) is attached hereto as **Exhibit 42**. Those bank records are addressed below.

324. On June 8, 2023, A to Z's counsel responded to Kinsale's request for the Chase bank records by denying that Shoman had banked with Chase at any time since April 2015. A true and correct copy of the June 8, 2023 email is attached hereto as **Exhibit 43.**

325. On June 9, 2023, A to Z's counsel also denied that any HS Wholesale invoices were paid using Chase QuickPay. *Id.* at 1.

326. On June 9, 2023, A to Z's counsel provided a copy of a Wholesale Agreement dated September 21, 2021 between A to Z and HS Wholesale. A true and correct copy of the Wholesale Agreement A to Z provided is attached hereto as **Exhibit 44.**

327. The HS Wholesale Agreement contained a Purchases and Payment section, which stated: "Payment shall be made to HS Wholesale Limited, [address]. Accepted forms of payment are: Behalf Financing, Credit Card (Visa, Mastercard, American Express, Discover), Certified Check, Bank Transfer, and QuickPay. All orders paid by credit card may be subject to a 3% surcharge. Orders made via Behalf Financing may incur a 1% surcharge." *Id.* at 1.

328. The HS Wholesale Agreement did not identify cash as an accepted form of payment. *Id.* at 1-2.

329. The HS Wholesale Agreement did not identify checks, other than Certified Checks, as accepted forms of payment. *Id.*

330. The HS Wholesale Agreement further provided: "No Goods will be processed until full payment is received." *Id.* at 2.

331. Accordingly, the HS Wholesale Agreement did not permit customers to pick up goods without first paying for them in full. *Id.*

332. On July 19, 2023, Masoud testified that she met Shoman through a mutual acquaintance approximately two years earlier. A true and correct copy of Masoud's Examination Under Oath transcript is attached hereto as **Exhibit 45.**

333. Masoud testified she was never employed by A to Z, and was not involved in A to Z's business or purchase of inventory, except for assisting Shoman with registering for an account with HS Wholesale, and that she only assisted Shoman due to a claimed language barrier. *Id.* at 8-11, 13-16, 20.

334. Masoud further testified that she did not assist Shoman with placing orders with HS Wholesale or any other vendor. *Id.* at 13.

335. On July 19, 2023, Masoud testified: "Essentially the only thing I did for him was sign up with a wholesaler, with HS Wholesale. And I had to view his documentation so I could upload it into their system for him to register as a purchaser. Like they have to verify his documentation." *Id.* at 10.

336. Masoud further testified: "And other than performing the registration, have you ever viewed any promissory notes on behalf of A to Z Wholesale or other tax documents or any other documentation from A to Z? A. No." *Id.* at 20.

**V.      Kinsale Pays A to Z's Claim**

337. On August 4, 2023, A to Z submitted a Sworn Statement in Proof of Loss signed by Shoman. The proof of loss asserted that the actual cash value of A to Z's loss was $6,248,085.71. A true and correct copy of the Sworn Statement in Proof of Loss is attached hereto as **Exhibit 46.**

338. In signing the Sworn Statement in Proof of Loss, A to Z and Shoman made several statements: "The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed; and no attempt to deceive

the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof." *Id.*

339. Kinsale responded with a letter stating that it could not accept the Proof of Loss in full due, in part, to the inability of A to Z to verify its claimed loss amount, the clear conflict between the claimed loss and the damaged inventory present at the fire scene, and missing documentation.

340. Despite the many issues and discrepancies with A to Z's claim, on or around December 6, 2023, and after a $15,000 deductible, Kinsale paid A to Z $1,330,065 for its claimed loss. A true and correct copy of Kinsale's letter dated December 5, 2023 and basis for Kinsale's payment are attached hereto as **Exhibit 47.**

341. Kinsale agreed to pay A to Z's claim to the extent it provided documentation of its claimed losses.

342. In doing so, Kinsale even gave A to Z the benefit of the doubt by paying portions of the claim where the supporting documentation was highly inaccurate and inconsistent.

343. In particular, the vast majority of the $1,330,065 payment was for checks drawn on the x0426 Account and cashier's checks associated with the x0426 Account. *Id.* at 3-4.

344. As discussed in greater detail below, those account records show a pattern of funds being recirculated through the account to create a fictitious transaction history.

**W.     Kinsale Receives Anonymous Tips**

345. On December 29, 2023, after Kinsale paid A to Z the $1,330,065, Kinsale received a voicemail from an anonymous female caller.

346. The caller stated that Shoman "filed a fraudulent claim."

347. The caller reported that the inventory that was claimed to be at the Gary Building was not, in fact, burned up in the fire, but that it had been sold off to others for cash.

348. In particular, the caller stated that 90% of the Juul products had been sold off.

349. The identity of the female caller remains unknown to Kinsale.

350. In January 2024, a Kinsale employee received two calls from a male caller who refused to give his name.

351. Like the previous caller, the second caller reported that the claim was fraudulent and the inventory was not present at the Gary Building at the time of the fire.

352. The caller reported that Shoman had opened another vaping business in Missouri under the name Everything Vape Wholesale.

353. The caller also reported that A to Z had concealed bank accounts from Kinsale, including accounts at Huntington Bank and BMO Bank.

354. The identity of the male caller remains unknown to Kinsale.

355. Kinsale located a business record for Everything Vape Wholesale, Inc. from Missouri.

356. According to documents filed with the Missouri Secretary of State, Shoman incorporated Everything Vape Wholesale, Inc. at an address in Florissant, Missouri on July 20, 2022, four months *before* his EUO, and a few months after the fire at the Gary Building.

357. On February 8, 2024, Kinsale sent a letter to A to Z's attorney, Poracky, disclosing the two anonymous tips and its discovery of Everything Vape Wholesale, Inc. A true and correct copy of Kinsale's February 8, 2024 letter is attached hereto as **Exhibit 48.**

358. Kinsale's letter stated: "The existence of this business contradicts the prior statements provided by Mr. Shoman in his EUO and corroborates the information provided by the second anonymous caller. Kinsale understandably has serious questions regarding the veracity and completeness of information provided by A to Z to Kinsale." Kinsale also requested a second EUO of Shoman. *Id.* at 2.

359. The second EUO did not take place until February 7, 2025, after A to Z retained new counsel, Mark Cishek, and produced some documents related to Everything Vape

Wholesale, as well as some additional bank records and what purported to be Shoman's personal tax returns. A true and correct copy of Shoman's second EUO transcript is attached hereto as **Exhibit 49.**

## X.     Shoman Provides Unsupported Testimony and Fabricated Documents for Everything Vape Wholesale

360.    During his second EUO, Shoman testified that the address he used to incorporate Everything Vape was false. *Id.* at 66-68.

361.    The address on the documents he filed with the Missouri Secretary of State is the address of a furniture store. *Id.*

362.    Shoman testified that he never operated a business out of the furniture store address that he provided to the Missouri Secretary of State. *Id.* at 66-67.

363.    Shoman testified that he wanted a Missouri address because Missouri did not tax vaping products. *Id.* at 70.

364.    Shoman testified that Everything Vape had no physical location in Missouri or anywhere else. *Id.* at 70, 84.

365.    Shoman testified that Everything Vape never purchased insurance. *Id.* at 65.

366.    Shoman testified that Everything Vape had no storage and never maintained inventory. *Id.* at 66, 70.

367.    Shoman testified that Everything Vape had no bank account. *Id.* at 122-23.

368.    Shoman testified that all of the purchases Everything Vape made from suppliers were in cash. *Id.*

369.    Shoman testified that he only purchased products once he received an order from his customer. *Id.* at 72-73.

370.    Shoman testified that he bought products for Everything Vape from American Distributors. *Id.* at 71.

371. During his EUO, Shoman was shown a 2022 tax return for Everything Vape, which listed $249,327 in gross receipts or sales. Shoman testified that figure was accurate. *Id.* at 80.

372. He further testified that all of those sales were made in cash to a single customer in St. Louis. *Id.* at 123.

373. Shoman was able to provide only a first name for his contact with that customer. Shoman testified that he did not know the contact's last name or phone number, and he believed that his contact had since left the country. *Id.* at 112-16.

374. Shoman testified that every time he received an order from his customer, he would purchase the products from one of the vendors near Chicago and give them to a friend who regularly traveled to St. Louis to deliver. *Id.* at 83-88.

375. Shoman further testified that he would meet Masoud at a coffee shop near their homes, and she would handwrite an invoice for him. *Id.* at 96-97.

376. The purported business model of Everything Vape Wholesale represented a dramatic change from the way A to Z supposedly conducted business. A to Z purportedly stockpiled millions of dollars in inventory without any plan as to how or to whom it might sell them, but Shoman claimed that Everything Vape Wholesale never purchased a single product unless it already had a customer order ready to fulfill.

377. Shoman testified that Masoud prepared all of the invoices, and he denied preparing any of them. *Id.* at 26-27.

378. Before the EUO, A to Z's counsel produced what were claimed to be Everything Vape Wholesale's sales invoices for 2022 and 2023.

379. Shoman's habit of falsifying business records in response to Kinsale's requests manifested itself once again. The production of Everything Vape Wholesale invoices included two different sets of invoices, at least one of which must have been altered.

380. Many of the Everything Vape Wholesale invoices were identical, except the dates were 12 months apart.

381. As one example, A to Z produced the following two invoices, which have identical invoice numbers, items, handwriting, and are identical in all respects, except that one is dated September 27, 2022 and the other is dated September 27, 2023:



382. Shoman testified that he had no explanation for who altered the invoices or why they were altered. *Id.* at 106-12.

383. Shoman could not explain which invoices were original and which were altered. *Id.*

384. There is no legitimate reason why Shoman would have two different sets of invoices dated exactly one year apart for the same transactions.

385. There is reason to doubt the genuineness of all of the purported sales invoices for Everything Vape Wholesale.

386. The 2022 invoices or the 2023 invoices or both were fabricated.

**Y.      Shoman Provides False Testimony Regarding His Tax Returns**

387. Before the EUO, Kinsale requested Shoman's tax returns for the years 2017 through 2023.

56

388.    A to Z's new counsel, Cishek, produced federal tax returns for Shoman for each of those years by email dated December 20, 2024.  Kinsale will be filing a forthcoming motion to file true and correct copies of what were claimed to be Shoman's 2017 through 2023 tax returns under seal as **Exhibits 50 through 56.**

389.    The returns were signed, but they were not dated and there was no proof they had been filed with the IRS. *See* Ex. 50-56.

390.    During his second EUO, Shoman testified that Masoud (to whom he referred to by her maiden name, Shukair) prepared his personal tax returns every year from 2017 through 2023. *See* Ex. 49 at 33-34.

391.    For example, Shoman gave the following answers:

Q.    In 2018, did Ms. Shukair help you prepare your taxes?

A.    Yes.

Q.    2019, did Ms. Shukair assist you in preparing your individual tax return?

A.    Yes.

Q.    In 2020, Ms. Shukair assisted you with preparing your taxes, individual taxes?

A.    Yes.

392.    *Id.* 40-41. Shoman gave similar answers with respect to each of the other years. *Id.* 37-44.

393.    Prior to the EUO, A to Z's counsel also produced what were claimed to be federal and state tax returns for Everything Vape Wholesale for 2022 and 2023.  Kinsale will be filing a forthcoming motion to file true and correct copies of the Everything Vape Wholesale returns produced by counsel under seal as **Exhibits 57 and 58.**

394.    The Everything Vape Wholesale returns were unsigned, undated, and no proof of filing was provided. *Id.*

395. Shoman testified that Masoud prepared both sets of returns for Everything Vape Wholesale. Ex. 49 at 26-27, 37

396. Shoman's testimony directly contradicted Masoud's testimony during her EUO in two ways.

397. First, Masoud testified on July 19, 2023, that she met Shoman approximately two years before her testimony in July 2023, so she would not even have known him in 2017, 2018, 2019, or 2020. Ex. 45 at 9.

398. Second, Masoud testified that the only thing she did for Shoman was help him register for an account with one wholesaler. *Id.* at 10.

399. In addition, Masoud specifically denied viewing any tax documents. *Id.* at 20.

400. When asked to explain these discrepancies after the testimony, A to Z's counsel provided an unsigned declaration from Shoman. A true and correct copy of the unsigned Shoman declaration is attached hereto as **Exhibit 59.**

401. Shoman's unsigned declaration stated: "In or around October 2024, I asked Ms. Masoud to help me file my personal taxes for the years 2017, 2018, 2019, 2020, 2021, 2022, and 2023. I had not filed returns for those years as of October 2024." *Id.* at 1-2.

402. The statements in the unsigned declaration from Shoman that he had at least seven years in which he failed to file his personal income taxes directly contradicted his sworn testimony in his second EUO that Masoud had helped him prepare each of those tax returns in the year in question.

### Z. Shoman Used the Kinsale Insurance Proceeds for Reasons Unrelated to A to Z

403. During the second EUO, Kinsale questioned Shoman about what he did with the $1,330,068 payment from Kinsale for A to Z's claimed losses. Ex. 49 at 10-23.

404. Shoman's answers revealed that Shoman had commingled A to Z's funds with his other vaping business, Everything Vape Wholesale, and his personal accounts.

405. In all, considerably less than half of the insurance proceeds were used for purposes associated with A to Z.

406. Shoman testified that he paid $200,000 to Saleh, and that he still owed Saleh $800,000 on his $1 million promissory note with A to Z. *Id.* at 10-11, 17.

407. Shoman testified that he paid $100,000 to Karakra, and that he still owed Karakra $2.9 million on his $3 million investment in A to Z. *Id.* At 12-13, 17.

408. Shoman testified that he paid approximately $88,000 to HS Wholesale to settle a balance owed by A to Z. *Id.* at 15, 17.

409. Shoman testified that he paid some legal fees to A to Z's tax attorney and the attorney who previously represented A to Z on the Kinsale claim. *Id.* at 19-22.

410. Shoman testified that A to Z had an outstanding balance with AGS of approximately $296,000, but that he did not pay any of the insurance proceeds to AGS. *Id.* at 16.

411. Instead of paying A to Z's outstanding debts or repaying A to Z's investors, Shoman instead used a portion of the Kinsale payment to support his other business, Everything Vape Wholesale. *Id.* at 17-19.

412. Shoman testified that he paid $100,000 to American Distributors for products he purchased on behalf of Everything Vape Wholesale. *Id.* at 17.

413. Shoman also testified that he repaid his only outside investor in Everything Vape Wholesale his entire $180,000 investment, even though that investor had not invested in A to Z. *Id.* at 18.

414. Shoman also testified that he used some of the Kinsale insurance proceeds for his own personal purposes, rather than A to Z's business purposes. *Id.* at 18-19.

415. Shoman used approximately $150,000 to repay a personal loan from his nephew. *Id.* at 19.

416.    Shoman also deposited an unspecified amount, which he testified was more than $100,000 but less than $500,000, into A to Z's business bank account, then transferred those funds to his personal bank account, then withdrew those funds in cash. *Id.* at 21-22.

417.    Finally, Shoman used "like around less than $200,000" of the insurance proceeds to buy gold. *Id.* at 18.

418.    Shoman did not specify what he did with the gold or how the purchase of gold had anything to do with A to Z's business.

AA.    **The Bank Records Provided by A to Z Show Highly Suspicious Transactions**

419.    Although A to Z claimed to have made most of its inventory purchases in cash, it did have a bank account, the x0426 Account, which it opened in February 2021. True and correct copies of the statements for the x0426 Account from February 2021 to December 2021 is attached hereto as **Exhibit 60**.

420.    After months of almost no activity, hundreds of thousands of dollars suddenly circulated through the x0426 Account between October 2021 and January 2022. By recirculating funds through the x0426 Account between October 2021 and January 2022, A to Z created a fictitious paper trail to support its claimed inventory purchases.

BB.    **A to Z's Account Activity Changed Dramatically in October 2021**

421.    During the first week the x0426 Account was open, four ATM deposits totaling $2,780 were made into the account at four different locations in Illinois. *Id.* at 3.

422.    That same week, the x0426 Account was used to make two debit card purchases totaling $2,670 at a tobacco wholesale business in Bensenville, Illinois. *Id.*

423.    After the first week it was open, there was minimal activity in the x0426 Account for the next several months.

424.    Between February 23, 2021 and September 13, 2021, the account balance never exceeded $500. *Id.* at 1, 9, 15, 21, 27, 31, 35, 39.

425. On September 14, 2021, the x0426 Account reflected a deposit of $9,900, which was withdrawn in cash the same day. *Id.* at 39.

426. No other transaction during September 2021 exceeded $100. *Id.* at 39-40.

427. As of September 30, 2021, the x0426 Account was overdrawn by $0.12. *Id.* at 40.

428. In October 2021, the activity in the x0426 Account changed dramatically:

- During October 2021, the x0426 Account reflected $378,709 in deposits and other credits, $120,789.80 in withdrawals and other debits, $143,221.28 in checks, and $21 in service fees. As of October 31, 2021, the account balance was $114,676.80. *Id.* at 41.

- During November 2021, the x0426 Account reflected $25,154 in deposits and other credits, $13,733.16 in withdrawals and other debits, $126,059.20 in checks, and $37.50 in service fees. As of November 30, 2021, the account balance was $0.94. *Id.* at 45.

- During December 2021, the x0426 Account reflected $264,185 in deposits and other credits, $39,564.36 in withdrawals and other debits, $222,029.40 in checks, and $1,081 in service fees. As of December 31, 2021, the account balance was $1,511.08. *Id.* at 51.

- During January 2022, the x0426 Account reflected $156,347 in deposits and other credits, $12,783.15 in withdrawals and other debits, $145,532 in checks and $175.60 in service fees. As of January 31, 2022, the x0426 Account was overdrawn by $632.67. *Id.* at 59.

429. A to Z provided Kinsale with images of checks drawn on x0426 Account and images of cashier's checks purchased by someone with access to the x0426 Account. Ex. 42.

430. The vast majority of the checks provided by A to Z were payable to HS Wholesale. *Id.* at 2-10, 15-19, 21-28.

**CC.    Cashier's Checks Were Suddenly Purchased at Multiple Bank Branches**

431. A to Z provided Kinsale with images of seven cashier's checks dated between October 7, 2021 and December 13, 2021. *Id.* at 1-9.

432. Five of the cashier's checks were payable to HS Wholesale, one was payable to AGS, and one was payable to American Distributors. *Id.*

433. A to Z did not purchase any other cashier's checks payable to a supplier at any other time.

434. The seven cashier's checks were purchased at five different branches of Bank of America. *Id.*

435. In one instance, a cashier's check payable to HS Wholesale was purchased at a Bank of America branch in Waukegan, Illinois. *Id.* 7-8.

436. The Waukegan branch is located 40 miles from HS Wholesale's facility in west suburban Addison, and more than 65 miles from the Gary Building in Gary, Indiana.

437. On information and belief, the purchaser(s) of the cashier's checks visited different branches to avoid drawing suspicion from bank employees.

**DD. Outgoing Funds from the x0426 Account Were Recycled Back Into the Account**

438. Many of the transactions reflected in the x0426 Account suggest that funds from outgoing checks were later deposited back into the x0426 Account.

439. For example, A to Z provided Kinsale with a copy of a cashier's check dated October 14, 2021, payable to HS Wholesale in the amount of $114,360. *Id.*

440. On October 20, 2021, the x0426 Account reflected a deposit of $114,360. Ex. 60 at 44.

441. As another example, A to Z provided Kinsale with a copy of Check Number 1031 dated October 21, 2021, payable to HS Wholesale in the amount of $23,786.88. Ex. 42 at 27.

442. On October 25, 2021, the x0426 Account reflected a deposit of $23,800. Ex. 60 at 44.

443. As a third example, A to Z provided Kinsale with a copy of Check Number 1045 dated December 16, 2021 payable to HS Wholesale in the amount of $160,694.40. Ex. 42 at 21.

444.	On December 20, 2021, the x0426 Account reflected a deposit of $158,366. Ex. 60 at 53.

445.	On information and belief, in each of the three example transactions above, as well as in other transactions reflected in the x0426 Account, funds identified in the check images as being drawn on the x0426 Account were returned to the x0426 Account.

446.	On information and belief, A to Z acted in concert with one or more person(s) acting or purporting to act on behalf of HS Wholesale. The identity of the person or persons acting or purporting to act on behalf of HS Wholesale is presently unknown to Kinsale.

447.	On information and belief, the x0426 Account reflects an effort by A to Z to create a paper trail for fictitious inventory purchases.

448.	The payment Kinsale made to A to Z was based on inventory for which A to Z provided evidence of payment. Ex. 47 at 1-2.

449.	Most of the amount paid by Kinsale was based on amounts shown in the check images and cashier's check images. *Id.* at 3-4.

## COUNT I: RESCISSION

450.	Kinsale realleges and incorporates herein by reference all prior Paragraphs, as if fully stated herein.

451.	In the written application for the Policy, A to Z made misrepresentations.

452.	The application falsely stated that the date A to Z's business started was December 1, 2021.

453.	In reality, A to Z claims to have purchased millions of dollars in inventory between February 7, 2021 and November 30, 2021 for which it now seeks payment from Kinsale, and it operated without any insurance during that entire time period.

454. The application falsely stated that A to Z had three full-time employees and two part-time employees.

455. In reality, A to Z had no employees other than Shoman.

456. The application falsely stated that A to Z's annual revenues were $20 million.

457. In reality, A to Z never made any sales, never had any purchase agreements for future sales, never had a website through which online sales could be made, and never hired any web designers or other professionals to design a website.

458. The application falsely stated that A to Z had a formal safety program in operation, including that A to Z had a safety manual and safety position, that A to Z conducted monthly safety meetings, and that A to Z complied with OSHA requirements.

459. In reality, Kinsale had no formal safety program, no safety manual, no safety position, conducted no monthly meetings, and had no OSHA compliance procedures.

460. The misrepresentations by A to Z in the written application for the Policy materially affected Kinsale's acceptance of the risk and the hazard assumed by Kinsale.

461. Based on the material misrepresentations by A to Z in the written application for the Policy, Kinsale is entitled to a declaration that the Policy is rescinded, and that Kinsale has no obligations whatsoever under the Policy.

## COUNT II: FAILURE TO COMPLY WITH PROTECTIVE SAFEGUARDS CONDITION OF COVERAGE

462. Kinsale realleges and incorporates herein by reference all prior Paragraphs, as if fully stated herein.

463. As a condition precedent to coverage, the Policy required A to Z to maintain certain specified "Protective Safeguards" in complete working order and in the "on" position at all times. Ex. 7 (Policy, Protective Safeguards Endorsement, Section A.1 and A.2.)

64

464. The Policy required A to Z to notify Kinsale of the suspension or impairment of any "Protective Safeguard" required by the Policy. Ex. 7 (Policy, Protective Safeguards Endorsement, Section A.3.)

465. One "Protective Safeguard" A to Z was required to maintain was a "Video Surveillance System." Ex. 7 (Policy, Protective Safeguards Endorsement, Schedule.)

466. The "Video Surveillance System" required interior and exterior video cameras that were capable of recording in daylight and hours of darkness, operable in all weather conditions, functional 24 hours per day, 7 days per week, and that provided coverage of all exterior doors and windows. Ex. 7 (Policy, Protective Safeguards Endorsement, Section C, P-7.)

467. The "Video Surveillance System" was required to include data storage that maintained no less than 14 days of continuous footage recorded by all cameras. Ex. 7 (Policy, Protective Safeguards Endorsement, Section C, P-7.)

468. A to Z never installed any interior or exterior video cameras at the Gary Building.

469. A to Z never notified Kinsale that it had not installed a "Video Surveillance System" or that the operation of a "Video Surveillance System" was suspended or impaired.

470. A to Z failed to comply with the condition precedent of the Protective Safeguards Condition of Coverage by: (1) failing to install a "Video Surveillance System," and/or (2) failing to inform Kinsale that a "Video Surveillance System" was not operational.

471. As a result of A to Z's failure to comply with the Protective Safeguards Condition of Coverage, there is no video evidence of what inventory was at the Gary Building prior to the fire.

472. As a result of A to Z's failure to comply with the Protective Safeguards Condition of Coverage, there is no video evidence of the cause or origin of the fire.

473.     Based on A to Z's failure to comply with the condition precedent to coverage of the Protective Safeguards Condition of Coverage, Kinsale is entitled to a declaration that no coverage is provided by the Policy for the loss A to Z claims to have sustained.

## COUNT III: BREACH OF DUTIES IN THE EVENT OF LOSS CLAUSE

474.     Kinsale realleges and incorporates herein by reference all prior Paragraphs , as if fully stated herein.

475.     The Policy imposes duties on A to Z in the event of loss or damage.  Ex. 7 (Policy, Building and Personal Property Coverage Form, Section E.3.8.)

476.     During the course of Kinsale's investigation, Shoman provided false sworn testimony on several subjects, including but not limited to:

   a.  His previous employment and the existence of Everything Vape Wholesale;

   b.  The purchase of products from American Distributors for Everything Vape Wholesale rather than A to Z; and

   c.  That his personal tax returns were prepared contemporaneously from 2017 through 2024, rather than that he failed to file personal tax returns for at least seven years.

477.     During the course of Kinsale's investigation, Shoman admitted in sworn testimony that he engaged in conduct involving misrepresentations and concealment in several respects, including but not limited to:

   a.  Admitting that he misappropriated funds paid by Kinsale for the benefit of A to Z for his own personal benefit;

   b.  Admitting that he misappropriated funds paid by Kinsale for the benefit of A to Z for the benefit of his other vaping business, Everything Vape Wholesale; and

   c.  Admitting that he listed a false address for Everything Vape Wholesale on its filings with the Missouri Secretary of State to avoid paying taxes.

478.     During the course of Kinsale's investigation, A to Z provided Kinsale with several documents containing materially false information, including but not limited to:

66

a. Promissory Note, dated March 1, 2021;

b. Partnership Agreement, dated March 1, 2021;

c. 2021 Financial Statements;

d. 2022 Financial Statements;

e. 2021 Tax Return;

f. 2022 Tax Return;

g. Form 8300 for Karakra, dated March 8, 2023;

h. Form 8300 for Saleh, dated March 8, 2023;

i. Form 8300 for Shoman, dated March 8, 2023; and

j. Invoices for Everything Vape Wholesale with altered dates in 2022 and 2023.

479. A to Z engaged in other business practices and conduct that were misleading or that interfered with Kinsale's investigation, including but not limited to:

a. Failure to maintain the required "Video Surveillance System";

b. Provided an inventory list prepared by Halawa, who never saw any of the inventory, never saw any photographs of any of the inventory, and never contacted any vendors to verify purchases;

c. Claimed to have received millions of dollars in physical cash from investors without any documentation that funds were provided;

d. Claimed to have paid millions of dollars in physical cash to suppliers without any documentation that funds were paid;

e. Failed to create and file required tax forms and returns;

f. Failed to create, and maintain in the ordinary course of business, customary records, including profit and loss statements, inventory lists, and proofs of payment;

g. Failed to create, and maintain in the ordinary course of business, bills of lading, shipping documents, and proofs of delivery of inventory;

h. Provided inconsistent documentation and testimony regarding the location of A to Z's business;

i. Fabricated business and tax records months or years after the fact;

67

j.  Provided Kinsale with tax documents that had not been filed with the IRS at the time they were provided to Kinsale;

k.  Claimed a loss of inventory that exceeded by more than $2 million the total amount of money A to Z claimed to have ever received from its investors; and

l.  Used the x0426 Account to create a paper trail for fictitious inventory purchases.

480.    Through the conduct described above, A to Z breached several of the Duties in the Event of Loss or Damage imposed by the Policy, including but not limited to:

**(2)**     Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)**     As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(5)**     At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)**     As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)**     Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)**     Cooperate with us in the investigation or settlement of the claim.

Ex. 7 at 13.

481.    Based on A to Z's failure to comply with the Duties in The Event of Loss or Damage, as required by the Policy, Kinsale is entitled to a declaration that no coverage is provided by the Policy for the loss A to Z claims to have sustained.

## COUNT IV: BREACH OF CONCEALMENT, MISREPRESENTATION OR FRAUD PROVISION

482.    Kinsale realleges and incorporates herein by reference all prior Paragraphs , as if fully stated herein.

483.    The Concealment, Misrepresentation or Fraud provision of the Policy states:

> If the Insured shall make any material misrepresentation or conceal facts either before or after a loss or make a claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void, and all claims hereunder shall be forfeited.

Ex. 7 at 30. (Policy, Common Conditions – Property, Paragraph 5.)

484.    In the written application for the Policy, A to Z made several false statements, including but not limited to:

    a.   The date its business started;

    b.   Its number of employees;

    c.   Its anticipated annual sales; and

    d.   The existence of a formal safety program.

485.    During the course of Kinsale's investigation, Shoman provided false sworn testimony on several subjects, including but not limited to:

    a.   His previous employment and the existence of Everything Vape Wholesale;

    b.   The purchase of products from American Distributors for Everything Vape Wholesale rather than A to Z; and

    c.   That his personal tax returns were prepared contemporaneously from 2017 through 2024, rather than that he failed to file personal tax returns for at least seven years.

486.    During the course of Kinsale's investigation, Shoman admitted in sworn testimony that he engaged in conduct involving misrepresentations and concealment in several respects, including but not limited to:

    a.   Admitting that he misappropriated funds paid by Kinsale for the benefit of A to Z for his own personal benefit;

69

b.  Admitting that he misappropriated funds paid by Kinsale for the benefit of A to Z for the benefit of his other vaping business, Everything Vape Wholesale; and

c.  Admitting that he listed a false address for Everything Vape Wholesale on its filings with the Missouri Secretary of State to avoid paying taxes.

487.  During the course of Kinsale's investigation, A to Z provided Kinsale with several documents containing materially false information, including but not limited to:

a.  Promissory Note, dated March 1, 2021;

b.  Partnership Agreement, dated March 1, 2021;

c.  2021 Financial Statements;

d.  2022 Financial Statements;

e.  2021 Tax Return;

f.  2022 Tax Return;

g.  Form 8300 for Karakra, dated March 8, 2023;

h.  Form 8300 for Saleh, dated March 8, 2023;

i.  Form 8300 for Shoman, dated March 8, 2023; and

j.  Invoices for Everything Vape Wholesale with altered dates in 2022 and 2023.

488.  A to Z engaged in other business practices and conduct that was misleading or that interfered with Kinsale's investigation, including but not limited to:

a.  Failure to maintain the required "Video Surveillance System";

b.  Provided an inventory list prepared by Halawa, who never saw any of the inventory, never saw any photographs of any of the inventory, and never contacted any vendors to verify purchases;

c.  Claimed to have received millions of dollars in physical cash from investors without any documentation that funds were provided;

d.  Claimed to have paid millions of dollars in physical cash to suppliers without any documentation that funds were paid;

e.  Failed to create and file required tax forms and returns;

    f.   Failed to create, and maintain in the ordinary course of business, customary records, including profit and loss statements, inventory lists, and proofs of payment;

    g.   Failed to create, and maintain in the ordinary course of business, bills of lading, shipping documents, and proofs of delivery of inventory;

    h.   Provided inconsistent documentation and testimony regarding the location of A to Z's business;

    i.   Fabricated business and tax records months or years after the fact;

    j.   Provided Kinsale with tax documents that had not been filed with the IRS at the time they were provided to Kinsale;

    k.   Claimed a loss of inventory that exceeded by more than $2 million the total amount of money A to Z claimed to have ever received from its investors; and

    l.   Used the x0426 Account to create a paper trail for fictitious inventory purchases.

489.    Through the conduct described above, A to Z made material misrepresentations both before and after the loss.

490.    Through the conduct described above, A to Z concealed facts from Kinsale both before and after the loss.

491.    Through the conduct described above, A to Z made a claim knowing the same to be false, as regards amount and otherwise.

492.    Based on A to Z's breach of the Policy's Concealment, Misrepresentation or Fraud provision, Kinsale is entitled to a declaration that the Policy is void, all of A to Z's claims are forfeited, and no coverage is provided by the Policy for the loss A to Z claims to have sustained.

## PRAYER FOR RELIEF

Kinsale requests that the Court enter judgment in its favor:

1.      Declaring that the Policy is rescinded;

2.      Declaring that no coverage is provided for A to Z's claims because of A to Z's failure to comply with the condition precedent to coverage of the Protective Safeguards Condition of Coverage to maintain a "Video Surveillance System;"

3.      Declaring that no coverage is provided for A to Z's claims because of A to Z's failure to comply with the Duties in The Event of Loss or Damage provision of the Policy;

4.      Declaring that the Policy is void, all of A to Z's claims are forfeited, and no coverage is provided for A to Z's claims because of A to Z's breach of the Policy's Concealment, Misrepresentation or Fraud Provision; and

5.      Awarding such other and further relief as the Court deems just and proper.


Dated: February 9, 2026                          Respectfully submitted,

                                                 /s/ *Jared Clapper*
                                                 Jared Clapper, ARDC # 6292565
                                                 Christopher White, ARDC # 6280031
                                                 Keshini Mahesan, ARDC # 6353328
                                                 CLYDE & CO US LLP
                                                 30 South Wacker Drive, Suite 2600
                                                 Chicago, IL 60606
                                                 T:  312.635.7000
                                                 Jared.clapper@clydeco.us
                                                 Christopher.white@clydeco.us
                                                 Keshini.mahesan@clydeco.us

                                                 *Attorneys for Defendant Kinsale Insurance Company*

**CERTIFICATE OF SERVICE**

I, Jared Clapper, an attorney, certify that on February 9, 2026, I caused the foregoing

to be electronically filed with the Clerk of Court using the CM/ECF System, which will send

notification of such filing to all counsel of record, including the following attorneys:

Brooke L. Stevens
Mark A. Cisek
Tyler Pearson
SEIDEN LAW GROUP, P.C.
333 South Wabash Avenue, Suite 2700
Chicago, Illinois 60604
(312) 236.3060 ph/(312).236.3061 fax
mcisek@seidengroup.law
bstevens@seidengroup.law
tpearson@seidengroup.law

*Attorneys for Plaintiff A to Z Wholesale, Inc.*

       /s/*Jared Clapper*
       Jared Clapper